**UNITED STATES of America**

v.

**Patrick A. DUNBAR.**

**Crim. No. H–79–11.**

United States District Court,
D. Connecticut.

May 23, 1979.

Thomas S. Luby, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Thomas G. Dennis, South Windsor, Conn., for defendant.

## RULING ON MOTION TO SUPPRESS

NEWMAN, District Judge.

Defendant's motion to suppress presents what appears to be an issue of first impression in the long history of interpretations of the Fourth Amendment's standard of "reasonableness"—whether a police officer may stop a motorist for reasons unrelated to any law enforcement or regulatory purpose, but solely to be of assistance to the driver. The stop in this case was made because the police officer believed the motorist was lost.

The episode occurred at approximately 1:00 a. m. on September 22, 1978, in the small community of Brooklyn, Connecticut, located near the Rhode Island border. State Trooper Herbert Burnham was in his police vehicle on Brooklyn Common Road at a stop sign at the intersection of Route 6, a main road from Brooklyn to Rhode Island. While stopped, Burnham saw the defendant's automobile moving east on Route 6 through the intersection. He estimated the car was travelling 20 miles per hour, and thought this was unusually slow for an area with a posted speed limit of 35 miles per hour. As the car passed through the intersection, in front of the patrol car headlights, Burnham saw the driver looking around as if to see the areas to each side of the car. When the rear of the car became visible, Burnham noticed that it had a Rhode Island license plate. Burnham had spent more than four years with the Connecticut State Police, all in the Brooklyn area, and had found that people frequently become lost while driving in that area. Suspecting that the defendant might be lost, Burnham pulled on to Route 6 behind the car, planning to pull him over. Before giving the defendant any indication to stop, Burnham observed the defendant's car make a right turn on to Route 169 a few hundred yards past the Brooklyn Common Road intersection. Route 169 leads away from the Rhode Island border. At this point Burnham was persuaded that the driver had made a wrong turn and was lost. Burnham turned on the flashing blue lights atop his vehicle to signal defendant's car to stop. He did this after defendant had started his turn on to Route 169. Defendant obeyed the signal and pulled to a stop 100 yards down Route 169 from the turn off of Route 6.

Burnham approached the driver and asked for his license and registration. As he did so, Burnham also looked into the interior of the car with the aid of his flashlight. He did this, in the interest of personal safety, to determine if there were any weapons. The driver produced papers and acknowledged that he was lost. Burnham observed on the passenger's side of the rear floor an object the size of a coffee can, with tape around it and what appeared to be a red fuse wrapped around the outside.

Based on his training with explosive devices, Burnham suspected this object was a bomb. He walked to the other side of the car, asked the driver to open the door, and picked up the object. Its weight heightened his suspicion that it was a bomb. He placed the object on the trunk of the car, returned to the driver's side, and asked the defendant to step out. As the driver got out, Burnham noticed an empty knife sheath at his belt and observed on the front seat of the car a large knife. Burnham then arrested the defendant for possession of a dangerous weapon, the knife, in a motor vehicle. Burnham then searched the trunk to determine if there was any other device with a potential for danger and discovered a can marked "black powder" and a role of tape.

Defendant was indicted for possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). He has moved to suppress all of the items taken from the car.

The Government's initial response to the facts of this case is to assert that the limitations of the Fourth Amendment do not apply because the Trooper's action in stopping the defendant's car was not taken to enforce any penal or regulatory law, but was motivated solely by a desire to be of assistance to the motorist. In such circumstances, the Government contends, the interests of the individual in maintaining his privacy from intrusion are not inevitably at odds with governmental purposes and there is also no likelihood of the abuses that can flow from the "competitive enterprise" of law enforcement. *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

While neither side has found any decision on the lawfulness of a stop unrelated to any penal or regulatory purpose, there is no basis for resolving this dispute without reference to the standards of the Fourth Amendment. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth and Fourteenth Amendments, even though the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse*, —— U.S. ——, ——, 99 S.Ct. 1391, 1393, 59 L.Ed.2d 660 (1979). See also *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Though that statement was made in the context of a stop made for the regulatory purpose of checking drivers' licenses and car registrations, the physical and psychological intrusion upon the stopped motorist, emphasized by the Court, is the same regardless of whether the police officer has a penal or regulatory purpose, or a benign purpose of rendering assistance. Moreover, the risk of abuse cannot be ignored. With motorists frequently travelling beyond the borders of the states in which their cars are registered, the stopping of drivers believed to be lost could become a pretext for conduct of the very sort against which the Fourth Amendment protects.

Thus, the issue becomes whether the stop in this case violates the Fourth Amendment's prohibition of "unreasonable" seizures. The Supreme Court has stated that the reasonableness of even brief stops "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce, supra*, 422 U.S. at 878, 95 S.Ct. at 2579. See also *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Determining the weights on each side of the balance is somewhat elusive. At times the Court has spoken of probable cause, expressing the view that when criminal law enforcement is not the objective of the challenged intrusion, the probable cause test is less rigorous than it would otherwise be, at least in those circumstances where a warrant is required and the issue is what considerations justify a warrant. See *Camara v. Municipal Court, supra*. At other times the Court has indicated that a probable cause analysis is "unhelpful" in the absence of any claim that the challenged police action is a subterfuge for criminal investigation. See *South Dakota v. Opperman*, 428 U.S. 364, 370 n.5, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

In this case, there is no need to consider the degree to which probable cause might have to be established in a non-criminal context because the facts known to Burnham, perceived through the eyes of a prudent officer of his experience, establish a sound basis for his belief that the defendant was lost.

■ The first part of the "balance" inquiry is an assessment of whether the intrusion promotes "legitimate governmental interests." *Delaware v. Prouse, supra,* —— U.S. at ——, 99 S.Ct. at 1396.

There is a dearth of authority to assist in assessing the weight to be assigned to the governmental interest in this case. Almost every case upholding police authority to arrest, search, or stop and briefly detain has involved police action in aid of some criminal or regulatory provision. More broadly, the Supreme Court has recognized that some privacy intrusion may be carried out by police in the performance of what have been called "community caretaking functions," *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady* police removed a car from an accident scene and later searched the trunk for a revolver. The car was removed for safety reasons, and the trunk was searched "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443, 93 S.Ct. at 2529. This latter purpose was arguably partially for the benefit of the car owner. In *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968), the search of a car impounded as evidence was upheld "to protect the car while it was in police custody." *Cady* subsequently characterized *Harris* as upholding an intrusion "to safeguard the owner's property," 413 U.S. at 447, 93 S.Ct. at 2531, thereby indicating approval of action taken arguably for the benefit of the owner as well as to protect the police against allegations of theft. See also *South Dakota v. Opperman, supra,* 428 U.S. at 369, 96 S.Ct. 3092.

It would be too extravagant to contend that a benign purpose of rendering assistance could never justify the stop of a motorist. The most rigorous view of the Fourth Amendment would not bar police officers from stopping a motorist to inform him that a bridge beyond a bend in the road had just been washed away. Some might contend that, as soon as time permitted, even this situation could be handled less intrusively by placing barricades to close the road, but a stopping of cars to warn and suggest alternate routes scarcely seems unreasonable. Other situations can be imagined where a road remains passable, yet police officers legitimately promote safety by stopping motorists to inform them about road hazards.

■ Aiding a motorist believed to be lost advances no substantial safety interest. It is arguable that the lost motorist, if not assisted, might interfere with the peacefulness of a neighborhood at 1:00 a. m. by seeking directions from a householder, but that concern is tenuous. Moreover, the interest in aiding the motorist, for his own benefit or that of the local residents, can in most situations be as well served by having the police officer make his presence known and leaving to the motorist the decision as to whether to stop and seek directions. Thus, while the interest of government in aiding a lost motorist may be considered "legitimate" within the meaning of *Prouse,* it is an interest entitled to extremely slight weight in the balance mandated by *Brignoni-Ponce.*

On the individual's side of the balance, the interest is also not especially weighty. The privacy intrusion is brief and normally uneventful. However, it does entail the risk of creating "substantial anxiety," *Delaware v. Prouse, supra,* —— U.S. at ——, 99 S.Ct. at 1391, and is a selective stopping that is viewed by the Supreme Court as more intrusive than a stopping of all motorists at a given point. See *United States v. Martinez-Fuerte,* 428 U.S. 543, 558, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

Judicial scales are not well calibrated to compare the slight governmental and privacy interests on either side of the balance in this case. Two considerations persuade me that the balance ought to be struck on the side of privacy. The policy of the Fourth Amendment is to minimize governmental confrontations with the individual. That policy is not furthered by permitting police officers to stop citizens not even remotely suspected of any conduct in violation of criminal or regulatory standards, simply for the well-intentioned purpose of providing directions. Moreover, however well-intentioned the stopping may have been in this case, the risk of abuse is real. The "plain view" principle has spawned numerous cases where the police officer says, "I saw him drop the package." See Comment, "Police Perjury in Narcotics 'Dropsy' Cases: A New Credibility Gap," 60 Geo.L.J. 507 (1971). The investigative stop authority announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), has led to cases where the officer says, "He looked suspicious." *E. g., United States v. Mallides*, 473 F.2d 859 (9th Cir. 1973); *United States v. Westerbann-Martinez*, 435 F.Supp. 690 (E.D.N.Y.1977). The Fourth Amendment stands against initiating a new line of cases in which the officer says, "I thought he was lost."

Finally, the Government suggests that even if the stop should be held to transgress Fourth Amendment standards, this is an inappropriate case for application of the exclusionary rule. While the rule does not preclude all use of illegally obtained evidence, see *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), there is no authority for relaxing the rule to permit the use in evidence at trial of evidence obtained as a direct result of a Fourth Amendment violation. Indeed, it is more tempting to consider a rule that would permit police officers to stop and give assistance to lost motorists provided that any evidence thereby obtained could not be used. And while it is also tempting to apply the exclusionary rule only to subsequent cases, rather than to this case where an officer acted in good faith and not in violation of any explicit rule previously announced, the Supreme Court has indicated that Article III considerations require according the benefit of a constitutional interpretation to the individual in whose case the decision is reached. *Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

The motion to suppress is granted.