COMMONWEALTH vs. ANNE E. LEONARD.

Suffolk. February 7, 1996. - April 18, 1996.

Present: Liacos, C.J., Wilkins, Abrams, Lynch, & Fried, JJ.

*Search and Seizure,* Automobile, Expectation of privacy. *Constitutional Law,* Search and seizure.

A State police officer acted reasonably in opening the driver's door of an automobile parked in a breakdown area on a parkway at about one o'clock in the morning, in circumstances in which the officer was unable with lights or siren or by tapping on the window to get the attention of or a response from the middle-aged female operator and where there was no blocking of the vehicle's way or show of force: the officer's observations of the driver's intoxication and of her subsequent disorderly conduct were properly admissible and should not have been excluded as evidence. [506-509] Liacos, C.J., dissenting.

COMPLAINT received and sworn to in the Charlestown Division of the District Court Department on May 16, 1994.

A motion to suppress evidence was heard by *Peter W. Agnes, Jr.,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Abrams,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*W. Matthew Iler,* Assistant District Attorney, for the Commonwealth.

*Richard H. Gens* for the defendant.

FRIED, J. Anne Leonard, the defendant, claims that her rights protected by art. 14 of the Declaration of Rights of the Massachusetts Constitution and the Fourth Amendment to the United States Constitution were abridged when a State trooper opened her automobile door without her permission. The District Court judge agreed and suppressed all evidence acquired after what he concluded was an improper intrusion. A single justice of this court allowed the Commonwealth's

application for interlocutory review and referred the case to the Appeals Court. We transferred the case here on our own motion, and now reverse.

The only evidence before the District Court judge was Trooper David E. Ford's police report. We set out the relevant portions, only expanding the abbreviations. "At approx. 0100 hrs. on 05-14-94 this [trooper] observed a 1982 Dodge [sedan], color blue, Ma. [registration] 659-CTF operating on Storrow Dr. [westbound] before the Lagoon area. As I pulled alongside this vehicle, to pass same, the [motor vehicle] pulled into the breakdown area adjacent to the Lagoon. This [trooper] observed a white female, approx. 50-60 yrs. of age [operating] said [motor vehicle]. As I was now beyond the cut-out area and the [motor vehicle] traffic was heavy behind me I continued on to the Bowker Overpass where I made a U-turn, exited at the Govt. Center exit and headed [westbound] to the [motor vehicle] in question. At this time I pulled my cruiser alongside the [motor vehicle] and activated my blue lights. After several attempts at using the PA system and air-horn to gain the attention of the female operator, to no avail, I backed my cruiser into the cut-out. At this point I approached the [motor vehicle] on the driver[']s side and knocked on the driver[']s window approx. 3-4 times. When no response to my knocking elicited any response from the operator, I opened the driver[']s door. At this time the female [operator], whom I recognized from my previous passing, looked up at me & said 'what the fuck do you want'. I then asked [subject] what was wrong. She stated 'what the fuck do you care'. At this time I asked [subject] for her license & [registration], which she eventually produced after a couple of minutes of searching her pocketbook. During this time I observed a strong odor of liquor coming from [subject's] breath, as I was only inches away from her face. This [trooper] then asked [subject] how many drinks she had had. [Subject's] response was 'I don't drink you bastard.' "

Ford then told Leonard to step outside the vehicle, which she refused to do. With the help of another trooper who had just arrived on the scene Ford forcibly removed her. She resisted and was physically and verbally abusive. Leonard was informed that she was being placed under arrest and was brought to police headquarters where she was booked and charged with operating a vehicle while under the influence of alcohol and disorderly conduct.

The District Court judge suppressed all evidence of Leonard's intoxication and disorderly conduct on the ground that the evidence was obtained after Trooper Ford had opened the door to Leonard's automobile and that Trooper Ford's opening that door violated Leonard's rights under art. 14 and the Fourth Amendment.[1]

In our view, Trooper Ford was doing his duty as he patrolled the highway to inquire whether the driver of the automobile was ill or in some other kind of difficulty. This reflex is so naturally helpful and so appropriate to his duties that Leonard's repeated failure to respond in any way to Ford's attempts to attract her attention could only excite further concern on his part. When she did not respond — not with a gesture, a smile, or a nod of the head — to his taps on her window, the circumstance must have appeared even more unusual and the possibility that the driver was seriously ill much more likely. At this point he opened her automobile door; and if that was a reasonable and legally permissible thing to do, the evidence he discovered should not have been excluded.

It is a premise of the District Court judge's reasoning that by opening the automobile door Trooper Ford invaded Leonard's constitutionally protected privacy rights and so required prior justification under the Fourth Amendment and art. 14. And since there was not even a reasonable suspicion that a crime had been committed — and the Commonwealth claims none — the judge was well on his way to the conclusion that there was here a violation of constitutional rights. The judge considered that only our reasoning in *Commonwealth* v. *King*, 389 Mass. 233 (1983), might deflect him from that conclusion. In that case we considered an encounter with a station wagon parked, its engine running, in a rest area on a cold winter night. The encounter began with an inquiry, proceeded by the police blocking the station wagon's departure, and escalated to a gun fight. In *King*, we stated that "[t]he investigatory check of a parked vehicle during winter months, regardless of its limited purpose and brevity,

---

[1]Although this court has decided that in some circumstances art. 14 provides greater protection than the Fourth Amendment, see, e.g., *Commonwealth* v. *Blood*, 400 Mass. 61, 74 (1987) (wiretaps); *Commonwealth* v. *Upton*, 394 Mass. 363 (1985) (confidential informants), the defendant has offered us no compelling reason to expand the protection of art. 14 here.

is an intrusion on privacy rights." *Id.* at 241. "The initial inquiry [however] was for an entirely different purpose from the detection or investigation of possible violations of criminal statutes or violations of vehicle use regulations. . . . The purpose of the investigatory check was to determine whether there was a need by the State trooper to render assistance or aid." (Citations omitted.) *Id.* at 242. For the District Court judge, however, *King* was not enough to justify the trooper's action here. Always assuming that Trooper Ford's opening of the automobile door went beyond the kind of interaction between police and private parties that requires no articulable suspicion or any justification at all, *Terry* v. *Ohio*, 392 U.S. 1, 19 (1968), the District Court judge read our decision in *King* to justify such investigatory intrusions only if undertaken pursuant to some policy mandating a check on all vehicles in similar situations. In *King, supra* at 242, we did say:

> "The very limited and focused inspection of a vehicle to determine whether assistance or aid is required is a minimal intrusion on the occupant's, or owner's, expectation of privacy. The situation here does not involve a random stop causing concern, fright, or anxiety. . . . It does not involve a situation where a more limited alternative is possible or where there is no constraint on the discretion of the law enforcer. . . . The policy required every stopped and parked car to be inspected. The policy limited the intrusion only to that time period when the hazards arise." (Citations and footnote omitted.)

Remarks in our decision in *Commonwealth* v. *Helme*, 399 Mass. 298, 302 (1987) ("The policy of investigating parked automobiles with interior lights on is too broad to justify even the limited intrusion of approaching the car to determine 'if everything is all right'"), supported the judge's reading. The District Court judge concluded that there must be "circumstances suggesting a medical problem . . . along with a police policy based upon a careful weighing of the public interest in intervention against the individual's right to privacy and that severely limits police discretion." Since there was no claim that Trooper Ford "was acting in accordance with an official policy of the state police . . . and [no] specific facts

and circumstances suggesting that the defendant was engaged in criminal activity or injured," the judge concluded that the trooper had no right to open the vehicle door.

To begin with, it is not clear that anything Trooper Ford did up to and including opening the automobile door went beyond the kind of police-citizen interchange that constitutes no intrusion and requires no justification.[2] See *Terry, supra* at 19 n.16 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred"). See also *Florida* v. *Bostick,* 501 U.S. 429, 436 (1991) (no seizure when officers boarded bus and asked to inspect passenger's baggage); *Florida* v. *Rodriguez,* 469 U.S. 1 (1984) (Fourth Amendment not implicated by inquiry of passenger at airport); *INS* v. *Delgado,* 466 U.S. 210 (1984) (no seizure during document check at factory); *Commonwealth* v. *Doulette,* 414 Mass. 653, 657 (1993); *Commonwealth* v. *Sanchez,* 403 Mass. 640 (1988); Model Code of Pre-Arraignment Procedure 257 (1975) (while law enforcement officers may not seek cooperation "in such a way as to imply an obligation to cooperate, if cooperation is forthcoming, the fact that it is in response to a police request should not render it suspect as coerced or involuntary"). Thus *Terry* itself makes clear that the sliding scale of reasonableness should not be taken to mean that every encounter between police and citizen initiated by the police must potentially be justifiable to a court. Up until the opening of the automobile door, which is the action in issue here, unlike both *King, supra* at 241, and *Helme, supra* at 299, there was no blocking of Leonard's way, no show of force, in short nothing inconsistent with a routine inquiry requiring no justification in a court. Even if opening an unlocked vehicle door, where the police officer is acting out of concern for the well being of the person inside rather than on the basis of a suspicion of criminality, passes some constitutional threshold requiring constitutionally sufficient

_____

[2]As the District Court judge noted, "The Commonwealth [argues] that this case falls into a special category of cases in which the police are justified in interfering with a motorist's liberty without probable cause and without a warrant because there is reason to believe the motorist may be in need of assistance."

justification, the District Court judge overreads our decisions as requiring that actions as reasonable as Trooper Ford's are only permissible if taken pursuant to an explicit and perhaps even invariable policy. Leonard's stopping when and where she did suggested that she was in difficulty. Her failure even to acknowledge Trooper Ford's inquiry suggested that she may have been quite ill. At that point her automobile door is opened. Unlike the more intrusive actions exemplified in *Delaware* v. *Prouse,* 440 U.S. 648 (1979) (wholly discretionary investigatory stop of vehicle on highway); *Commonwealth* v. *McGeoghegan,* 389 Mass. 137 (1983) (roadblock sobriety test); or the blocking of the way exemplified in *King* and *Helme,* where the requirement of some articulated general policy was offered as a safeguard against arbitrary police action, what Trooper Ford did here was a minimally intrusive response to one of the myriad and uncategorizable events that may alert an officer that his assistance may be required. Although it is easy enough for us looking at this case after the fact to describe a category into which it might be placed, it would be a very lengthy and cumbersome rulebook indeed — or uselessly general one — that sought to anticipate and instruct a trooper in Ford's position just what to do in the circumstances of every such particular case.[3]

If there was an intrusion here, it was justified as reasonable in the circumstances. Once the trooper was justified in making his entry into the car, anything he acquired within the scope of his inquiry is properly admissible in a court of law. Cf. *King, supra* at 243. Thus, the evidence gleaned after the door was opened — the odor of alcohol on Leonard's breath and testimony as to her violent and abusive words and action — should not have been excluded. The District Court judge's suppression order is reversed.

*So ordered.*

---

[3]Decisions in other jurisdictions, while not on all fours with the facts of this case, support this conclusion. See, e.g., *United States* v. *Haley,* 581 F.2d 723, 726 (8th Cir.), cert. denied, 439 U.S. 1005 (1978) (entry into automobile to "seek identification or medical alert cards which might be of assistance" to a man found unconscious nearby who did not appear to be either hurt or under the influence of alcohol); *State* v. *Kersh,* 313 N.W.2d 566 (Iowa 1981) (defendant slumped behind steering wheel did not respond to knocks on window). See also 3 W.R. LaFave, Search and Seizure § 7.4(f), at 570 n.142 (3d ed. 1996) (collecting cases).

LIACOS, C.J. (dissenting). A great body of law has been painstakingly developed over many years to interpret and give meaning to our Federal and State Constitutions in such a manner as to protect the rights of the citizenry from the over-reaching of government. I had assumed it to be our responsibility to recognize overreaching by law enforcement personnel when it occurs. Today, the court is faced once again with the familiar complaint that the police have intruded into the domain of citizen privacy. In response, the court fails even to decide whether the officer involved conducted a search or a seizure. The court decides instead, contrary to the facts found by the District Court judge, that the police officer acted reasonably with good intentions, and looks no further.

Ignored also is the fundamental appellate principle that we ought to uphold a judge's subsidiary findings of fact if they are warranted by the evidence. *Commonwealth* v. *Silva*, 388 Mass. 495, 501-502 (1983). It is clear from the judge's memorandum of decision that he found no objective basis on which the trooper could have concluded the defendant was either engaged in criminal conduct or in need of aid or assistance. He stated that, "absent some specific facts and circumstances suggesting the defendant was engaged in criminal activity or injured, the trooper had no right to open the vehicle's door." Further, he found, "It is plain that the occupant of the vehicle either didn't hear his efforts to gain her attention or simply chose to ignore him." The judge quoted the defendant's memorandum in support of her motion to suppress: "There is no allegation that the defendant was at the time unconscious, in need of medical attention, or a danger to herself or others. The defendant simply refused to respond to the officer . . . ." Is it not true in this Commonwealth that, ordinarily, a citizen need not comply with a police request, and is free to walk away?[1] Noting the rule that it is the Commonwealth's burden to establish the legality of the search, it cannot be said that the judge's finding that the officer lacked objective justifica-

[1]General Laws c. 90, § 25 (1994 ed.), does provide that one "who, *while operating or in charge of a motor vehicle*, shall refuse, when requested by a police officer, to give his name and address . . . or *who shall refuse or neglect to stop when signalled to stop* by any police officer who is in uniform or who displays his badge conspicuously on the outside of his outer coat or garment . . . shall be punished by a fine of one hundred dollars" (emphasis supplied). This statute is not relied on by the Commonwealth or the court. In any event, it seems inapplicable to the facts of this case.

tion (i.e. that the defendant was in need of aid or assistance) for the intrusion into the defendant's automobile is clearly erroneous.

The court substitutes *its interpretation of the events for those of the judge.* The court states that, "[i]n our view, Trooper Ford was doing his duty as he patrolled the highway to inquire whether the driver of the automobile was ill or in some other kind of difficulty. This reflex is so naturally helpful and so appropriate to his duties that Leonard's repeated failure to respond in any way to Ford's attempts to attract her attention could only excite further concern on his part. When she did not respond — not with a gesture, a smile, or a nod of the head — to his taps on her window, the circumstance must have appeared even more unusual and the possibility that the driver was seriously ill much more likely." *Ante* at 506. Such assumptions cannot replace the obligation of an officer of the law to determine independently and objectively whether any particular person who, on his or her own initiative, pulls over to the side of a road does in fact appear to be in need of aid or assistance, or is engaged in suspicious conduct. Certainly a person in an automobile may pull off a highway to consult a road map, to look safely for an item lost between the seats, to remove a speck of dust from an eye, or for any number of benign reasons not raising the suspicions of a passing officer. Yet, the court states that the officer pulled in behind the defendant in this case "to inquire whether the driver of the automobile was ill or in some other kind of difficulty." *Ante* at 506. Neither the officer nor the Commonwealth advanced this claim, and the judge did not so find.

As the judge concluded, it is clear from our case law that opening the defendant's door constituted a seizure of the defendant's automobile. See *Commonwealth* v. *Sumerlin*, 393 Mass. 127, 128 & n.1 (1984), cert. denied, 469 U.S. 1193 (1985) (approaching car and opening door without inquiry of occupants is a search); *Commonwealth* v. *Podgurski*, 386 Mass. 385, 388, 390 (1982), cert. denied, 459 U.S. 1222 (1983) (poking head through open door into passenger compartment of windowless van is search and not "threshold inquiry"; looking through window without physical intrusion would not be search); *Commonwealth* v. *Almeida*, 373 Mass. 266, 269-270 (1977), *S.C.*, 381 Mass. 420 (1980) (ordering occupant

out of automobile parked at night with engine running, headlights off, and then opening the door was a justified "stop" where occupant delayed briefly in producing registration); *Commonwealth* v. *Tompert*, 27 Mass. App. Ct. 804, 806 (1989) ("That the defendant might have been free to drive away when [the officer] approached the truck is irrelevant. There can be no dispute that, when [the officer, without inquiry] opened the door, the defendant was stopped from doing anything other than what was ordered"). See also *Commonwealth* v. *Doulette*, 414 Mass. 653, 655 (1993) (looking into automobile with flashlight is not search). "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. . . . '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person,' . . . ." *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975), quoting *Terry* v. *Ohio*, 392 U.S. 1, 16 (1968). Accord *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985), quoting *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

The judge applied the proper law to the facts, discussing our cases of *Commonwealth* v. *Helme*, 399 Mass. 298 (1987), and *Commonwealth* v. *King*, 389 Mass. 233 (1983), *S.C.*, 400 Mass. 283 (1987), and the Appeals Court's decision of *Commonwealth* v. *Tompert*, *supra.* An initial police inquiry must rest on "specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience. A mere 'hunch' is not enough. Simple good faith on the part of the officer is not enough. The test is an objective one." *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 175-176 (1980), quoting *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974). The judge was correct when he stated that "when police conduct amounts to a stop or detention . . . there must be a prior justification either in the form of articulable facts and circumstances suggestive of criminal activity or circumstances suggesting a medical problem or [hazard] to safety or health." As the Commonwealth presented no such justification, the judge's conclusion that none existed is not clearly erroneous.

The *King, Helme,* and *Tompert* cases all involved standard

police policies requiring investigatory checks for highway safety purposes. While I agree that our cases have not explicitly required an established written policy to justify an investigatory stop, what we have required is some constraint on the discretion of the law enforcer. *Commonwealth* v. *Helme, supra* at 302. *Commonwealth* v. *King, supra* at 242. Accord *Delaware* v. *Prouse,* 440 U.S. 648, 655 (1979) (random automobile spot checks not based on probable cause give too much discretion to law enforcement); *United States* v. *Brignoni-Ponce, supra* at 882 ("In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government"); *Cady* v. *Dombrowski,* 413 U.S. 433, 443, 445 (1973) (search of automobile trunk pursuant to standard police policy lawful as protective of public safety). Standard procedures are universally recognized as a tool to determine the reasonableness of police conduct, and to ensure police actions are not a pretext. A pretext stop "occurs when an officer, who does not have a legally sufficient reason to search for evidence of a particular offense, uses another reason to seize potential defendants and justify the search." Note, Police Officers Must Meet "Reasonable Officer" Standard to Withstand Pretext Claim, 36 S. Tex. L. Rev. 629, 633 (1995). Accord *United States* v. *Arra,* 630 F.2d 836, 845 n.12 (1st Cir. 1980) (objective reasonableness of officer's action determines existence of pretext). "In the absence of standard police procedures which limit discretion, most police practices are entirely discretionary. Numerous authorities have stated, and one can easily imagine, the potential for abuse arising from unfettered police activity." Note, *supra* at 646. We have stated that a standard policy governing investigatory stops, if reasonable, can provide justification for a *Terry*-type stop in the absence of full probable cause. *Commonwealth* v. *Doulette, supra* at 656, citing *Commonwealth* v. *Tompert, supra.* The absence of such a policy supports the judge's finding of lack of specific and articulable facts.

It is reasonable to conclude that this court's reasoning will encourage police to fabricate stories of drivers potentially requiring aid and assistance as a pretext for stopping lone drivers at night on the highways and roads of the Commonwealth. See 3 W.R. LaFave, Search and Seizure § 7.5(e), at 590 (3d ed. 1996). This court should take extra care to

ensure the rights of the citizenry are not compromised by a zealous desire on the part of law enforcement to obtain arrests or convictions. It does not help to engage in a form of inappropriate appellate fact finding so as to say, without any facts of record, that Leonard's stopping when and where she did suggested that she was in difficulty, or to say: "Her failure even to acknowledge Trooper Ford's inquiry suggested that she may have been quite ill."[2] *Ante* at 509. " 'Policing' the police has been, is, and always will be a difficult task. Juries are reluctant to return judgments against police officers; verdicts often 'turn upon jurors' assessments of plaintiffs' character rather than upon the merits of the police action.' " (footnotes omitted). Maclin, When the Cure for the Fourth Amendment is Worse than the Disease, 68 S. Cal. L. Rev. 1, 64 (1994), quoting Skolnick & Fyfe, Above the Law at 203 (1995). The court today unfortunately reinforces this unnatural whittling away of the Fourth Amendment to the United States Constitution. I dissent.

---

[2] The trooper did not say anything of the kind. Nor did the judge so find.