## COMMONWEALTH *vs.* RICHARD J. CANAVAN.

No. 95-P-306.

Norfolk. March 8, 1996. - July 3, 1996.

Present: ARMSTRONG, KAPLAN, & GILLERMAN, JJ.

*Search and Seizure,* Automobile, Expectation of privacy. *Constitutional Law,* Search and seizure.

Discussion of the decision of *United States* v. *Dunbar,* 470 F. Supp. 704, 705 (D. Conn.), aff'd, 610 F.2d 807 (2d Cir. (1979), concerning whether a police officer may stop a motorist for the sole reason that the officer thought the motorist was lost, and related cases, including *Commonwealth* v. *Leonard,* 422 Mass. 504 (1996). |644-649|

A police officer who stopped a lawfully operated motor vehicle for the sole reason that he believed the motorist was lost made an unlawful seizure of the motorist and vehicle under the Fourth Amendment to the United States Constitution, and the officer's observations of the driver and of items in plain view in the vehicle, that had led to the motorist's being charged with operating a motor vehicle while under the influence of intoxicating liquor, should have been suppressed. |649|

COMPLAINT received and sworn to in the Wrentham Division of the District Court Department on January 11, 1993.

A motion to suppress evidence was heard by *Paul F. X. Moriarty,* J., and, after transfer to the jury session of the Dedham Division, the case was heard by *Gerald Alch,* J.

*Leon A. Geller* for the defendant.

*Robert C. Cosgrove,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant appeals from a judgment of conviction, after nonjury trial, of operating a motor vehicle while under the influence, second offense (G. L. c. 90, § 24). The conviction was consequent upon the refusal of a District Court judge to suppress evidence secured by the Commonwealth as the result of a police stop of the defendant's vehicle amounting, according to the defendant, to an illegal

seizure. If the defendant's contention succeeds, the conviction fails, as nothing of moment was added by the trial proper.

1. To summarize the testimony of Foxborough Officer Joseph McDonald, the only witness at the suppression hearing. In the early morning, January 10, 1993, McDonald, in a marked cruiser, was conducting a building security patrol in the vicinity of the rotary in central Foxborough. Six streets merge into the rotary. About 1:15 A.M. McDonald, driving northward toward the rotary on Central Street, one of these feeder streets, noticed a car (the defendant's) motionless, facing southward, near the point where Central Street meets the rotary. The defendant remained in this position for up to three minutes. He was looking around. McDonald circled the rotary to go to the rear of the defendant's car. The defendant moved very slowly and entered Central Street headed southward, at about fifteen miles per hour. (The speed limit there is twenty miles per hour; farther down the street it increases to forty miles per hour.) McDonald followed. The defendant turned a corner west onto Bassett Street, a side street, but McDonald continued on Central Street halting with his lights on at a closed Mobil gas station. Evidently the defendant took a further turn on Bassett Street and reentered Central Street through Clark Street, another side street. The defendant drove into the Mobil station near McDonald. There was no conversation between the two. The defendant left the Mobil station and drove down Central Street toward the rotary. McDonald got behind the defendant. Before the defendant reached the rotary, McDonald pulled him over by activating his lights and blasting his siren.

The defendant had not committed any traffic or vehicle violation, he had not crossed the center line or "weaved," his lights were on, he was going fifteen miles per hour in a twenty-mile-per-hour zone. McDonald made the stop because he believed the defendant was lost: the rotary was confusing, and he had seen the defendant's pause at the rotary and his reversal of direction on Central Street at the Mobil station.[1]

After the stop, McDonald asked the defendant for his

[1]According to the officer's testimony at trial, after the defendant left the Mobil station "he slowed down again, still looking around. At that point I determined that the subject was lost. He didn't know where he was going. He was looking from side to side looking for the signs."

license and registration. The defendant complied. McDonald asked the defendant whether he was lost. The defendant answered, "No." Now McDonald detected a strong odor of alcohol emanating from the defendant and observed in plain view an empty case of beer and an empty half-pint bottle of peppermint schnapps. The officer arrested the defendant on the drunken driving charge.[2]

2. The question on the motion to suppress was "whether a police officer may stop a motorist for reasons unrelated to any law enforcement or regulatory purpose, but solely to be of assistance to the driver," more particularly when "the police officer believe[s] the motorist [is] lost." Thus, United States District Judge (as he then was) Jon O. Newman formulated the issue, which was of first impression at the time, in *United States* v. *Dunbar,* 470 F. Supp. 704, 705 (D. Conn.), aff'd, 610 F.2d 807 (2d Cir. 1979).[3] The question is the same in the present case, and the facts in the two cases are not different in essence. In *Dunbar,* a Connecticut State Trooper, stopped in his vehicle at 1:00 A.M. at an intersection near the Rhode Island border, observed a car with Rhode Island plates moving at slow speed. The driver showed uncertainty in selecting the road and made what the trooper took to be a wrong turn. The trooper was confirmed in his belief that the driver was lost, as others in the trooper's experience had been at this location. Having pulled behind the car, the trooper turned on his blue flashing lights to signal the

---

[2]The motion judge did not make findings at the time. After appellate briefs were filed in this court, we entered an order requiring the judge to prepare and file his findings, with leave to counsel to make comments thereon by letter. In fact the judge adopted as his findings of fact and rulings of law those submitted to him by the Commonwealth. Correctly recorded in the findings is the basic proposition that the officer stopped the defendant thinking he might be lost. But subjoined as rulings of law are meditations of the Commonwealth. Thus, quite dubiously, appears the statement that the facts the officer observed could have warranted a reasonable suspicion that the defendant was under the influence. Also included as a ruling of law is the Commonwealth's view that the exclusionary rule should not apply even if the stop was unjustified. (Judge Newman's response to such a suggestion in *United States* v. *Dunbar,* 470 F.Supp. 704, 708 [D. Conn. 1979], discussed *infra,* was that "it is more tempting to consider a rule that would permit police officers to stop and give assistance to lost motorists provided that any evidence thereby obtained could not be used." The defendant has protested these liberties.

[3]Affirmed by oral opinion delivered in open court.

driver to stop. Approaching the driver, the trooper asked for his license and registration. The driver produced the papers and acknowledged he was lost. The stop led to the discovery of a large knife in plain view on the front seat of the car, for which the driver was arrested on the spot (possession of a dangerous weapon in a motor vehicle), and to the finding of an object the officer suspected to be a bomb on the rear floor of the car and, in the trunk, of materials for making bombs; as to these, the driver was later indicted for possession of an unregistered destructive device in violation of Federal statute.

The situation presented itself to the trooper as one where he must decide whether the artillery of a moving vehicle stop was the right way to confront this citizen who might be lost. Legal analysis joins with common perceptions to suggest an answer. The lawfulness of the stop, Judge Newman said, was submissible to the tests of the Fourth Amendment to the United States Constitution although the stop was made for a benign purpose: under *Delaware* v. *Prouse*, 440 U.S. 648, 655 (1979), "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." Was the seizure "unreasonable" and forbidden by the Fourth Amendment? This "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers" as suggested in *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The weights on the sides of the balance are hard to measure. The Supreme Court recognized in *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973), that police officers may intrude to some extent on the individual's privacy when they perform "community caretaking functions" unrelated to crime detection or regulatory purposes. And it is undeniable that the rendering of assistance to a motorist in that caretaking mode can in some situations justify motor vehicle stops — Judge Newman illustrates the point with a case where the police stop a motorist to inform him that a bridge beyond a bend in the road has washed away, or a case where a road remains passable but the police promote safety by stopping the motorist to inform him about road hazards. *United States* v. *Dunbar*, 470 F.Supp. at 707.

Centering, however, on the situation of the lost motorist, Judge Newman holds that the governmental safety interest in aiding the motorist is not substantial and entitled to "extremely slight weight" in the Fourth Amendment balance. Moreover, this interest, such as it is, may "be as well served by having the police officer make his presence known and leaving to the motorist the decision as to whether to stop and seek directions." *Id.* at 707. On the side of the individual, the interest is also not weighty, for the intrusion on privacy is "brief and normally uneventful," *ibid.*; yet "it does entail the risk of creating 'substantial anxiety,' *Delaware* v. *Prouse,* [440 U.S. at 657], and is a selective stopping that is viewed by the Supreme Court as more intrusive than a stopping of all motorists at a given point" (citations omitted). 470 F. Supp. at 707.

With the balance thus even or nearly so, Judge Newman was persuaded by two considerations that it should be struck on the side of privacy. First, "[t]he policy of the Fourth Amendment is to minimize governmental confrontations with the individual," and this is not promoted by permitting the police to stop nonoffending citizens simply to give them directions. And second, "the risk of abuse is real" as we see in the abuse of the "plain view" principle. "The Fourth Amendment stands against initiating a new line of cases in which the officer says, 'I thought he was lost.' " *Id.* at 708.[4]

Be it noted that the *Dunbar* reasoning does not invite an undue invasion of the Fourth Amendment into the community caretaking functions of the police: the multitudinous everyday contacts between police officers and individuals do not approach any need for forcible intrusions on privacy. On the other hand, *Dunbar* does not inhibit the police from making intrusions amounting to seizures when the governmental interest predominates — thus seizure even of lost motorists is justified when safety hazards are actually entailed and lights and sirens are needed to arouse the attention of the drivers and avoid mishap. Just so, Professor LaFave records his ap-

---

[4]Stops of the "I thought he was lost" ploy type would bear contrast with stops where the officer had probable cause to believe that traffic laws have been violated: the latter stops are legitimate even though the officer may have other investigatory motives. See *Whren* v. *United States,* 116 S. Ct. 1769 (1996); *Commonwealth* v. *Santana,* 420 Mass. 205, 207-209 (1995); Smith, Criminal Practice and Procedure § 305, at 214 & nn. 6.2 & 6.3 (Supp. 1996).

proval of the *Dunbar* decision and distinguishes a case, *State v. Oxley*, 127 N.H. 407 (1985), where in the particular situation seizure was justified to prevent endangering other drivers. 4 LaFave, Search and Seizure § 9.2(b), at 26-28 (3d ed. 1996).[5]

3. Understood as just indicated, the *Dunbar* decision would, we think, be generally accepted as sound. So a reading of opinions around the country, including those citing *Dunbar*, would suggest.[6] We believe, too, that our precedents in Massachusetts are compatible with a holding that rejects seizure and its consequences in any lost motorist case free of complicating elements (safety hazards, illness, suspicion of crime, or the like). Compare *Commonwealth* v. *Silva*, 366 Mass. 402, 405-407 (1974); *Commonwealth* v. *King*, 389 Mass. 233, 241-242 (1983); *Commonwealth* v. *Helme*, 399 Mass. 298, 300-302 (1987); *Commonwealth* v. *Doulette*, 414 Mass. 653, 655-657 (1993); *Commonwealth* v. *Tompert*, 27 Mass.

---

[5]Here Lafave cites other decisions for the same distinction, and quotes from *State* v. *Pinkham*, 565 A.2d 318, 319 (Me. 1989), that "[p]olice officers do not violate the Fourth Amendment if they stop a vehicle when they have adequate grounds to believe the driver is ill or falling asleep . . . . "

[6]See (cases citing *Dunbar*) *Crauthers* v. *State*, 727 P.2d 9, 11 (Alaska Ct. App. 1986); *Ozhuwan* v. *State*, 786 P.2d 918, 922 (Alaska Ct. App. 1990); *McDougal* v. *State*, 580 So. 2d 324, 325 (Fla. Dist. Ct. App. 1991); *Doheny* v. *Commissioner of Pub. Safety*, 368 N.W.2d 1, 2 (Minn. Ct. App 1985); *State* v. *Goetaski*, 209 N.J. Super. 362, 365-366 (App. Div. 1986) (but cf. *State* v. *Martinez*, 260 N.J. Super. 75 [App. Div. 1992]); *Wibben* v. *North Dakota State Hy. Commnr.*, 413 N.W.2d 329, 331 n.1 (N.D. 1987); *State* v. *Sarhegyi*, 492 N.W.2d 284, 286 (N.D. 1992); *State* v. *Guthmiller*, 499 N.W.2d 590, 593 (N.D. 1993)(concurring opinion); *Provo City* v. *Warden*, 844 P.2d 360, 363 (Utah Ct. App. 1992); *State* v. *Lambert*, 146 Vt. 142, 144 (1985); *Barrett* v. *Commonwealth*, 17 Va. App. 196, 200-201 (1993), rev'd on reh'g en banc, 18 Va. App. 773 (1994), rev'd, 250 Va. 243, 247-248 (1995); *State* v. *Chisholm*, 39 Wash. App. 864, 867 (1985); *State* v. *DeArman*, 54 Wash. App. 621, 626 (1989); *State* v. *Markgraf*, 59 Wash. App. 509, 513 (1990).

See also (not citing *Dunbar*) *Reeves* v. *State*, 20 Ark. App. 17, 20, 22-24 (1987); *People* v. *Deppert*, 83 Ill. App. 3d 375, 380-381 (1980); *State* v. *Pinkham*, 565 A.2d at 319-320; *State* v. *Oxley*, 127 N.H. at 410-411; *White* v. *Oklahoma Dept. of Pub. Safety*, 606 P.2d 1131, 1132 (Okla. 1980); *Leaper* v. *State*, 753 P.2d 914, 915 (Okla. Crim. App. 1988); *State* v. *Hibler*, 92 Or. App. 140, 143 (1988); *State* v. *Anderson*, 142 Wis. 2d 162, 167-169 (Ct. App. 1987). Cf. *United States* v. *Rodriguez-Morales*, 929 F.2d 780, 784-785 (1st Cir. 1991), cert. denied, 502 U.S. 1030 (1992); *United States* v. *King*, 990 F.2d 1552, 1560-156110th Cir. 1993).

App. Ct. 804, 806-808 (1989); *Commonwealth* v. *Berment,* 39 Mass. App. Ct. 522, 525-529 (1995).

In the recent case of *Commonwealth* v. *Leonard,* 422 Mass. 504 (1996) (4-1 decision), a State trooper while driving down Storrow Drive in Boston observed a 1982 Dodge automobile with a middle-aged woman alone in the car pulling into a "breakdown area" on the Drive. Conceiving that this driver might have entered the breakdown lane because she "was ill or in some other kind of difficulty," *id.* at 506, the trooper returned to the area and parked there and tried by air horn to attract the woman's attention. This failed. The trooper approached the car and tapped on the window. "When," said the court, "she did not respond — not with a gesture, a smile, or a nod of the head — to his taps on her window, the circumstance must have appeared even more unusual and the possibility that the driver was seriously ill much more likely." *Ibid.* At this point the trooper opened the (unlocked) car door, only to be met with the driver's harsh words. (It turned out that the driver was under the influence and was charged on that ground.) The court (by a majority)[7] said that the police action as a whole, the opening of the door included, might be seen as part of the interaction of citizen with police for the well being of the person and so raising no constitutional issue. *Id.* at 508-509. But if the door opening "passes some constitutional threshold requiring constitutionally sufficient justification," then there was justification enough in the trooper's reasonable apprehension that the driver was ill. *Ibid.* We need not discuss at any length the *Leonard* court's remark that the opening of the car door could figure as short of the constitutional line (i.e. short of "seizure"), for that issue does not arise in the present case; no doubt full-blown seizure occurred here. However, we note that the car in *Leonard* had already come to a halt and was stationary when the trooper acted: this tends to lower the level of the intrusion, as the courts have recognized. See *Commonwealth* v. *King,* 389 Mass. at 242. See also *Doheny* v. *Commissioner of Pub. Safety,* 368 N.W. 2d 1, 2 (Minn. Ct. App. 1985). Where the *Leonard* court says, in effect, that if the door opening was a seizure,

---

[7]The dissent's reading of the facts differs from the majority's. The dissent chides the majority for not respecting the trial judge's findings. *Id.* at 510-511.

the seizure was justified, the court accords with *Dunbar*, which would consider the likelihood of illness such a ground of justification. See the passage from LaFave mentioned above.

To return to the instant case, where there was no adequate justification for seizure, any governmental interest involved would have been "as well served" (*Dunbar*, 470 F. Supp. at 707) by Officer McDonald's merely "mak[ing] his presence known" (*id.*) and offering help if needed; and where could this have been done more opportunely than at the Mobil station? If the law were to condone seizures by the police in such a situation, ordinary citizens would have ground for complaining that they were being treated with less circumspection than persons accused of crime. See *Camara* v. *Municipal Court*, 387 U.S. 523, 530 (1967).[8]

The order denying the motion to suppress is reversed and an order is to enter allowing the motion. The judgment is reversed, the finding of guilt is set aside, and judgment is to enter for the defendant.

*So ordered.*

---

[8]We believe that the defendant should succeed on this appeal by reference to the Fourth Amendment but note that in argument on the motion to suppress the defendant relied primarily on *Commonwealth* v. *Bacon*, 381 Mass. 642 (1980), which discusses State as well as Federal constitutional law. His reply brief on appeal refers expressly to art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Williams*, 422 Mass. 111, 115 n. 9 (1996); *Commonwealth* v. *Stoute*, 422 Mass. 782, 786 n. 7 (1996).