IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30700-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KYLE KEITH TRAPP, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Once again we address the constitutionality of a law enforcement

officer's encounter with an individual convicted of a crime based upon evidence seized as

a result of the encounter. The superior court, after a bench trial, convicted Kyle Trapp

for possessing heroin. Trapp appeals, arguing the police discovered the heroin only after

he was unlawfully seized, and thus the superior court should have suppressed evidence of

the drug. We disagree and affirm his conviction.

In addition, Kyle Trapp contends his sentence is incorrectly based on an offender

score that erroneously counts convictions more than five years old, in violation of RCW

9.94A.525(2)(c). Because Trapp has been released from confinement, we hold this issue

is moot.

FACTS

On May 15, 2011, at 3:45 p.m., Richland Police Patrol Sergeant Curtis Smith responded to a 911 call that a man parked in a ubiquitous 7-Eleven store's parking lot may be in medical distress. The caller, a clerk at the store, reported that the man was unconscious or possibly dead. While en route to the store, Smith used his on board computer to determine, by the license plate provided by the store clerk, that Kyle Trapp was the registered owner of the car. Smith also employed the computer to learn that Trapp was previously convicted as a violent offender. City medics were dispatched to the scene because of medical concerns. "[F]or fear of their safety," Smith requested that the medics wait before assisting Trapp. Clerk's Papers (CP) at 24.

When Sergeant Curtis Smith arrived at the 7-Eleven, he spotted the car matching the license plate number provided by dispatch, along with a male "slumped motionless behind the wheel of the car." Report of Proceedings (RP) at 6. Trapp reclined in a manner inconsistent with one taking a nap. Smith saw no signs of life. In his 15 years as an officer, Smith had not observed anyone parked in a public parking lot, in mid-afternoon, who looked unconscious or dead.

While waiting for another officer to arrive, Smith parked his car behind Trapp's vehicle. After two or three minutes, Kyle Trapp "spr[u]ng to life and immediately reached [for] the [car's] ignition." RP at 8. Trapp backed his car several feet, in a

"normal" fashion, until he noticed, through his side mirror, Sergeant Smith. RP at 24. Smith, who wore his police uniform, waved at Trapp and Trapp stopped his car.

Sergeant Smith approached Kyle Trapp's car and asked Trapp to roll down his window. Smith introduced himself, explained he was conducting a welfare check, and asked Trapp if he was okay. Smith sought to assess the condition of Trapp and noticed immediately that Trapp was confused, disoriented, and slow in speech, had constricted pupils and attention difficulty, and was unable to communicate in a linear or meaningful manner. Smith asked Trapp again if he was "okay" and Trapp said, "[y]es, I must have dozed off for a bit, I got up early today." CP at 25. Curtis Smith told Kyle Trapp he was concerned with his medical condition and whether he could safely operate a car. Trapp told Smith that he took hydrocodone earlier that day. He admitted that he did not have a prescription for the pills and that a pill bottle in his possession had the patient's name stricken.

In an effort to assess Trapp's medical condition, Smith asked some additional standard questions. Trapp could not provide the correct time of day or correct date and could not rationally explain why he was slumped over the wheel. Trapp gave contradictory stories as his reason for being in the parking lot. Trapp's "agitation, evasiveness, and nervousness increased with every question." CP at 25. Based on his experience, Sergeant Smith believed Trapp to be under the influence of an opiate.

3

During the questioning, Smith noticed Trapp repeatedly tap a blue bank deposit bag located next to Trapp's right hip on the driver's seat.

Sergeant Smith grew concerned about whether Kyle Trapp possessed a weapon. Smith instructed Trapp to exit the vehicle so that Smith could search Trapp for weapons. Trapp did not comply with the instruction. As Smith opened the door to remove Trapp, Trapp unzipped the blue bank bag and stuffed money in the bag. When Kyle Trapp opened the blue bag, Sergeant Smith saw two orange capped hypodermic syringes and a burnt spoon in the bag. From experience and training, Smith concluded the contents included drug paraphernalia with possible drug residue. After removing Trapp from the car, Smith searched Trapp's clothing and removed a lighter and knife.

After questioning Kyle Trapp for about 10 minutes, Sergeant Smith told the medics to leave the scene. No medic examined Trapp.

Sergeant Curtis Smith summoned a Drug Recognition Expert from the Richland Police Department to evaluate Kyle Trapp. The Drug Recognition Expert found Trapp to be under the influence of a narcotic drug but not to the degree that his ability to drive was impaired. Smith released Trapp, but seized his vehicle. Smith applied for and executed a search warrant for the vehicle and its contents, and found heroin and drug paraphernalia.

Before trial, Kyle Trapp moved to suppress the evidence of heroin and paraphernalia under CrR 3.6. After hearing testimony from Sergeant Curtis Smith, cover

4

officer Troy Glasgow, and Kyle Trapp, the court made 17 findings of fact and concluded

as a matter of law:

1. The approach of the defendant by the police was proper under the community caretaking function.
2. The detention of the defendant was proper as both an investigation into the defendant's medical condition.
3. The investigation into possible driving while intoxicated charges and drug possession charges.

CP at 44. The court admitted the heroin found during the search of Trapp's car.

Kyle Trapp stipulated to the findings of fact the court entered at the suppression hearing

while reserving the right to appeal the lawfulness of the contact between Sergeant Smith

and him and the seizure of contraband. Based on the stipulated findings of fact, the court

found Trapp guilty of possession of heroin.

At sentencing, the State identified and Kyle Trapp stipulated to four prior

convictions for class C felonies dating from 1993 to 2002. Based on these prior

convictions, the State calculated an offender score of four, resulting in a standard range

between 6 and 18 months confinement. The State recommended and the court sentenced

Trapp to 9 months, beginning on March 14, 2012. Although Trapp is now released from

prison, he claims error to the stipulated number of convictions.

LAW AND ANALYSIS

Seizure

When reviewing claims of unlawful searches and seizures, we often must isolate discrete actions of a police officer during an extensive encounter, as if the actions are separate frames in a movie. Kyle Trapp conveniently minimizes our task by complaining only about being seized when Sergeant Smith waved for him to stop as Trapp backed his car, rather than viewing Smith's conduct in its greater context—a stop precipitated by a call that a man may be gravely ill or dead outside a 7-Eleven parking lot. Trapp argues the seizure was unlawful under the Fourth Amendment to the United States Constitution. In his framing of an issue, Kyle Trapp contends that the seizure also violated article I, section 7 of the Washington Constitution, but he presents no argument that, under his circumstances, the Washington Constitution provided him additional protection from police activity. Therefore, we do not address whether the conduct of Sergeant Smith violated the state constitution. "If a party does not provide constitutional analysis based upon the factors set out in *Gunwall*, [*State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986)] the court will not analyze the state constitutional grounds in a case." *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 224, 840 P.2d 174 (1992).

Before addressing whether Sergeant Smith's seizure of Kyle Trapp was reasonable and thereby lawful, we must address whether any seizure occurred at the time Smith waved at Trapp. The State contends that contacting a driver who appears

6

incapacitated is not a seizure. If Smith did not seize Trapp, Smith needed no justification to interact with Trapp. *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Since Sergeant Smith did more than contact Kyle Trapp and since Trapp was not incapacitated when Smith waved at him, we conclude that under the circumstances, the wave constituted a seizure. We question the importance of addressing whether Trapp was seized, however. The issues of whether a citizen is seized and whether any seizure is reasonable are theoretically distinct questions, but often courts blur the line between the questions. The more reasonable an alleged seizure, the more likely a court is to rule there was no seizure. The State justifies the conduct of Sergeant Smith based upon the officer's community caretaking function. At least one decision suggests law enforcement officer action pursuant to the community caretaking function to be conduct short of a seizure. *See State v. Mennegar*, 114 Wn.2d 304, 309, 787 P.2d 1347 (1990). Another decision suggests such action is a justifiable seizure. *See State v. O'Neill*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003). Our trial court did not expressly rule if and when the "seizure" of Kyle Trapp occurred.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." But "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S. Ct. 1870,

64 L. Ed. 2d 497 (1980). The defendant carries the burden to establish that he was seized. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998); *State v. Thorn*, 129 Wn.2d 347, 354, 917 P.2d 108 (1996).

A seizure occurs when, "'considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority.'" *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009) (quoting *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004)). Stated differently, a police contact constitutes a seizure only if, under the totality of the circumstances, a reasonable person would not have felt free to leave, "terminate the encounter, refuse to answer the officer's question, or otherwise go about his business." *Thorn*, 129 Wn.2d at 353. "The relevant question is whether a reasonable person in the individual's position would feel he or she was being detained." *Harrington*, 167 Wn.2d at 663 (citing *O'Neill*, 148 Wn.2d at 581).

Our courts, with help from other courts, have announced other propositions helpful in determining whether a law enforcement officer's interaction with a citizen constitutes a "seizure." Police activities such as engaging a citizen in conversation, identifying themselves as officers, or simply requesting identification do not convert a casual encounter into a seizure. *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State v. Knox*, 86 Wn. App. 831, 838-39, 939 P.2d 710 (1997). On the other hand, the threatening presence of several officers, the display of a weapon,

touching the defendant, and commanding language or tone of voice suggest that the encounter may have constituted a seizure. *Mendenhall*, 446 U.S. at 554. Where an officer commands a person to halt, a seizure occurs. *O'Neill*, 148 Wn.2d at 581. The subjective intent of the police is irrelevant, except insofar as it is conveyed to the defendant. *Mendenhall*, 446 U.S. at 554. Instead, we consider the officer's actual conduct and whether it reasonably appeared to be coercive. *Thorn*, 129 Wn.2d at 353. Whether there was any show of authority on the officer's part, and the extent of any such showing, are crucial factual questions in assessing whether a seizure occurred. *O'Neill*, 148 Wn.2d at 577.

Sergeant Curtis Smith's wave to Kyle Trapp coupled with his parking his car behind Trapp's car would lead a reasonable person to believe he or she is not free to leave. The wave directed Trapp to stop his vehicle after which Smith approached Trapp. Trapp noticed Smith wearing a police uniform. The wave was tantamount to an order to halt.

In *State v. Bennett*, 62 Wn. App. 702, 705, 814 P.2d 1171 (1991), defendant and his companions parked their car in the parking lot of a ubiquitous 7-Eleven. Police officers drove their respective cars into the parking lot to check the license plate of the car in the parking lot. Officer Montalvo parked behind the car, while Officer Woo parked behind Montalvo. Officer Montalvo testified that he did not use his flashing red lights, but that he and Officer Woo parked in such a manner that the car would have been

9

unable to leave the parking lot. The court held that the blocking of the car constituted a "seizure" for Fourth Amendment purposes. In *State v. Crane*, 105 Wn. App. 301, 311, 19 P.3d 1100 (2001), the court also considered an officer's parking his car behind a citizen's car to be a factor when ruling a seizure occurred.

The State contends "Washington and a number of other jurisdictions have held that contact with a vehicle where the driver is slumped over the wheel and appears incapacitated is not a seizure." Br. of Resp't at 3. Trapp's circumstances, however, are distinguishable from those the State cites: *State v. Knox*, 86 Wn. App. 831, 939 P.2d 710 (1997) *overruled on other grounds by O'Neill*, 148 Wn.2d 564; *Commonwealth v. Leonard*, 422 Mass. 504, 663 N.E.2d 828 (1996); *State v. Zubizareta*, 122 Idaho 823, 839 P.2d 1237 (1992); *People v. Murray*, 137 Ill. 2d 382, 560 N.E.2d 309 (1990); *State v. Clayton*, 113 Idaho 817, 748 P.2d 401 (1988); *State v. Kersh*, 313 N.W.2d 566 (Iowa 1981). The State's cases involve incapacitated drivers in parked cars. In *Knox*, an intoxicated Knox sat in a stupor inside his car on the deck of a state ferry, blocking departing vehicles. The cases support the conclusion that Sergeant Smith had grounds to immediately approach Trapp as the latter sat incapacitated upon Smith's arrival at the parking lot. Numerous decisions, including those cited by the State, hold no seizure occurs when an officer approaches a parked car and asks the driver to roll down his window. *O'Neill*, 148 Wn.2d at 579; *see also Knox*, 86 Wn. App. at 839-40; *State v. Young*, 135 Wn.2d 498, 511, 957 P.2d 681 (1998); *State v. Thorn*, 129 Wn.2d 347, 353,

917 P.2d 108 (1996) *overruled on other grounds by O'Neill*, 148 Wn.2d 564. But Sergeant Smith did not approach Trapp as the latter sat in a parked car. Kyle Trapp was conscious and operating a car when Smith waved for him to stop. Sergeant Smith seized Trapp.

### Community Caretaking Function

Having determined that Sergeant Curtis Smith seized Kyle Trapp, we must next ask whether Smith's seizure violates the Fourth Amendment warrant requirement. If police unconstitutionally seize an individual prior to arrest, the exclusionary rule calls for suppression of evidence obtained via the government's illegality. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); *Harrington*, 167 Wn.2d at 663. Because Smith lacked a warrant to seize Trapp, the seizure must be covered by a lawful exception to the warrant requirement or the evidence must be suppressed. This issue depends on whether the community caretaking exception to the warrant requirement applies.

As a general rule, warrantless seizures are per se unreasonable under the Fourth Amendment to the United States Constitution. *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). "Nonetheless, there are a few jealously and carefully drawn exceptions to the warrant requirement which provide for those cases where the societal costs of obtaining a warrant . . . outweigh the reasons for prior recourse to a neutral

magistrate." *State v. Kinzy*, 141 Wn.2d 373, 384, 5 P.3d 668 (2000). The State bears the burden of proving by clear and convincing evidence that the seizure was a stop pursuant to an exception to the warrant requirement. *State v. Garvin*, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009).

The community caretaking exception to a warrantless seizure was first announced by the United States Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973), which observed with respect to the Fourth Amendment to the United States Constitution that:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

(Emphasis added.) The exemption has been extended well beyond auto accidents. "Many citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid." *Hudson v. City of Wenatchee*, 94 Wn. App. 990, 996, 974 P.2d 342 (1999). The exemption, in Washington, also extends to routine checks on health and safety. *Kinzy*, 141 Wn.2d at 386. Citizens of this state expect police officers to do more than react to crimes that have already occurred. *O'Neill*, 148 Wn.2d at 576. They also expect the police to investigate when circumstances are

suspicious, to interact with citizens to keep informed about what is happening in a neighborhood, and to be available for citizens' questions, comments, and information citizens may offer. *Id.*

The community caretaking function exception applies when "'(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.'" *Kinzy*, 141 Wn.2d at 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)). Whether the community caretaking exception applies "'depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a 'community caretaking function.'" *Kinzy*, 141 Wn.2d at 387 (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)).

Once the exception applies, police officers may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community caretaking function. *State v. Gleason*, 70 Wn. App. 13, 17-18, 851 P.2d 731 (1993). The noncriminal investigation must end when reasons for initiating an encounter are fully dispelled. *State v. DeArman*, 54 Wn. App. 621, 626-27, 774 P.2d 1247 (1989).

Many of the decisions cited by the State to support its argument that no seizure occurred support its position that any seizure was justifiable under the community

13

caretaking function exemption. For example, according to *Commonwealth v. Leonard*, 422 Mass. 504, 508-09, 663 N.E.2d 828 (1996), opening of an unlocked vehicle door, when the police officer is acting out of a concern for the well being of the person inside, rather than on the basis of a suspicion of criminality, passes the constitutional threshold. Police are justified in interfering with a motorist's liberty without probable cause and without a warrant because there is reason to believe the motorist may be in need of assistance. *Id.* at 509 n.2. If the police find a person unconscious or disoriented and incoherent in a vehicle, it is reasonable for them to enter the vehicle for the purpose of giving aid to the person in distress and of finding information bearing upon the cause of his condition. *Clayton*, 113 Idaho at 748; *Kersh*, 313 N.W.2d at 568; *Anchorage v. Cook*, 598 P.2d 939, 942 (Alaska 1979); *Guardiola v. State*, 268 Ind. 404 375 N.E.2d 1105 (1978); *Howell v. State*, 300 So.2d 774, 775 (Miss. 1974).

Kyle Trapp contends that his "coming to life" before Sergeant Trapp stopped him and his backing his car "normally," ended the justification for detaining him. We disagree. Sergeant Smith received a call that reported Trapp looked dead. Smith's initial view of Trapp showed no signs of life. A driver's acting normally for split seconds should not quiet an officer's belief that a driver of a car is ill or disoriented. Trapp's ability to reverse the car one to two feet without lurching likely demonstrated he was not dead, but did not dispel a reasonable belief that he may need medical attention.

14

If Smith had not stopped Trapp, the latter would have proceeded to operate his car on city streets. Concern over his medical health was amplified because of the potential risk he posed to the community at large by driving impaired. In *Wibben v. North Dakota State Highway Commissioner,* 413 N.W.2d 329 (N.D. 1987), the court ruled the State's interest in determining whether a person in control of an automobile was intoxicated, before the person had opportunity to actually drive in an intoxicated state, outweighed the person's Fourth Amendment interest in being left alone. The fact that Trapp's car was moving contributes to the finding that the stop was a "seizure" but also contributes to our holding that the seizure was justifiable. There is a constitutional difference between stopping a car and entering a home because of the ambulatory character of vehicles. *Cady,* 413 U.S. at 442.

Kyle Trapp also argues Curtis Smith's release of the medics establishes that Smith was not concerned about Trapp's medical condition. But Smith did not release the medics until he had spoken with Trapp for 10 minutes. By that time, Smith likely had justifiably determined he would not allow Trapp to drive, because of his incoherence.

The State also justifies Sergeant Smith's detaining of Kyle Trapp as a *Terry* or investigatory stop. Since we hold the detaining was constitutional under the community caretaking function exception, we do not address this second argument.

15

SENTENCING

Although Kyle Trapp argues that the trial court incorrectly calculated his offender score for purposes of sentencing, Trapp has already been released from confinement. He presents no argument that any error in sentencing impacts his life. Therefore, we find his second assignment of error to be moot. "'A case is moot if a court can no longer provide effective relief.'" *State v. Ross*, 152 Wn.2d 220, 228, 95 P.2d 1225 (2004) (quoting *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995)). In *Ross*, the court considered an appeal of an offender score moot because the defendant had been released from imprisonment.

Trapp still urges this court to determine the issue as one of public interest. A court may reach a determination on the merits of a moot issue in order to provide guidance to lower courts where "a case presents an issue of continuing and substantial public interest . . . that . . . will likely reoccur." *Ross*, 152 Wn.2d at 228 (citing *State v. Blilie*, 132 Wn.2d 484, 488 n.1, 939 P.2d 691 (1997)). Our Supreme Court has already decided this issue in *In re Personal Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002). Thus, we do not consider the issue one of continuing and substantial public interest.

No. 30700-0-III
*State v. Trapp*

CONCLUSION

We affirm the trial court's order denying Trapp's motion to suppress and affirm

his conviction.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Fearing, J.

Fearing, J.

WE CONCUR:

Kulik, J.P.T.

Siddoway, A.C.J.

17