MANSFIELD, Justice.
This case requires us to decide whether an officer was justified in pulling behind a vehicle and activating his emergency lights when the vehicle was stopped by the side of a highway after 1:00 a.m. with its brake lights engaged. We conclude the officer's actions were justified under the "community caretaking function" exception to the warrant requirement of the Fourth Amendment and article I, section 8 of the Iowa Constitution. For this reason, we affirm the conviction for operating while intoxicated that resulted from this roadside encounter.
I. Background Facts and Proceedings.
In the early hours of May 22, 2016, Story County Sheriff's Deputy Nicholas Hochberger was on assigned patrol in the southern part of the county. When he was outside Slater at approximately 1:08 a.m., he spotted a vehicle pulled over on the side of the highway with its brake lights on. Deputy Hochberger turned on his flashing red and blue lights, and he pulled to a stop behind the parked vehicle. Deputy Hochberger later testified his objective in making this kind of stop is to "check on the welfare of the occupants or see if they need any assistance, if they have vehicle problems or medical problems, or if they're just talking on their phone." Deputy Hochberger also explained why he activated his flashers:
First reason is it alerts traffic approaching any other direction that I am stopped on the side of the roadway and that there is potentially a hazard there; and number two is to alert the driver or subjects of the vehicle that it's just not a stranger pulling up behind them. It is a law enforcement officer stopping to check on them.
Deputy Hochberger did not run the vehicle's license plate through dispatch before exiting his vehicle. Instead, he immediately approached the driver's side window on foot to speak with the driver. While passing the rear of the vehicle, the deputy noticed a registration violation because the license plate bracket covered the sticker and it was not possible to tell whether the registration was current.
Upon reaching the driver's window, Deputy Hochberger immediately detected a strong odor of alcoholic beverage and noticed the driver's red and watery eyes. Deputy Hochberger's initial questions were directed at determining if there was an emergency or if the occupants needed assistance. He asked, "Hi guys, everything okay tonight?"
When the driver, Terry Coffman, and his wife indicated that they were okay, *243 Deputy Hochberger then asked, "[W]hat's going on?" Coffman answered that his wife was having neck issues, so he had pulled over to give her a back rub. At that point, Deputy Hochberger requested Coffman's license and registration and asked Coffman how much he had had to drink that night. Coffman replied that he had consumed four beers, the most recent a half hour before the stop.
Deputy Hochberger administered field sobriety tests, which Coffman failed. Coffman was belligerent while performing the tests. After also administering a preliminary breath test, the deputy determined that Coffman was under the influence of alcohol and placed Coffman under arrest. At the jail, implied consent was invoked, and Coffman refused to submit to the chemical test.
On June 16, Coffman was charged by trial information in the Iowa District Court for Story County with operating while intoxicated (OWI), first offense, in violation of Iowa Code section 321J.2, a serious misdemeanor. See Iowa Code § 321J.2(2)(a ) (2016).
On August 25, Coffman filed a motion to suppress the evidence obtained as a result of the stop of his vehicle. He alleged the stop violated his rights under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. An evidentiary hearing on Coffman's motion took place on September 9, and the court issued a written ruling denying the motion on September 12.
Coffman filed a motion to reconsider, to reopen the record, and for expanded findings and conclusions. This motion asked the court for the first time "to distinguish the Fourth Amendment protections from those under the Iowa Constitution." In particular, Coffman asked the court either to limit the community caretaking doctrine "to those cases where emergency aid or assistance is needed or alternatively apply[ ] the exclusionary rule to those cases where evidence of criminal activity is gathered as a result of a community caretaking seizure." The court issued expanded findings and conclusions but confirmed its denial of the motion to suppress.
In its order, the court noted,
A car parked on the shoulder of a highway at 1:00 a.m. in a rural area in Iowa should raise a number of concerns. There is a safety issue in having a vehicle parked within two feet of the traveled portion of a highway, especially at 1:00 a.m., in an area that is not lighted. Second, the occupant(s) of the vehicle might have car problems or medical issues that they are experiencing. Most people would not simply pull over to the side of the road in this type of setting at such an hour. It would have been irresponsible for Deputy Hochberger to simply drive by without checking on the vehicle.
Coffman waived his right to a jury trial and stipulated to a trial on the minutes of testimony. On October 12, the court found Coffman guilty of OWI, first offense, in violation of Iowa Code section 321J.2. The district court sentenced Coffman to two days in jail and ordered him to pay a fine and surcharges.
Coffman appealed, claiming that the stop of his vehicle and person violated the Fourth Amendment of the U.S. Constitution and article I, section 8 of the Iowa Constitution. We transferred the case to the court of appeals, which affirmed Coffman's conviction, concluding that the stop demonstrated a "good-faith effort by a peace officer to assist the motorist as a public servant rather than to launch a criminal investigation."
*244 We granted Coffman's application for further review.
II. Standard of Review.
Coffman argues that the seizure violated his rights under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. "When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." State v. Storm , 898 N.W.2d 140, 144 (Iowa 2017) (quoting State v. Brown , 890 N.W.2d 315, 321 (Iowa 2017) ). We examine the whole record and "make 'an independent evaluation of the totality of the circumstances.' " Id. (quoting Brown , 890 N.W.2d at 321 ). "Each case must be evaluated in light of its unique circumstances." State v. Kurth , 813 N.W.2d 270, 272 (Iowa 2012) (quoting State v. Krogmann , 804 N.W.2d 518, 523 (Iowa 2011) ).
III. Analysis.
Coffman claims that he was lawfully parked on the shoulder of the highway and that Deputy Hochberger's actions violated the Fourth Amendment and article I, section 8. See U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable seizures and searches, shall not be violated, and no Warrants shall issue, but on probable cause ...."); Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated; and no warrant shall issue but upon probable cause ...."). The State counters that the seizure of Coffman's vehicle was justified by the community caretaking exception to the warrant requirement under both the Fourth Amendment and article I, section 8.
A. The Community Caretaking Exception. The community caretaking exception to the warrant requirement, recognized by the United States Supreme Court in Cady v. Dombrowski , is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). This exception "involves the duty of police officers to help citizens an officer reasonably believes may be in need of assistance." State v. Tyler , 867 N.W.2d 136, 170 (Iowa 2015) (quoting State v. Kern , 831 N.W.2d 149, 172-73 (Iowa 2013) ). We have addressed this exception on a number of occasions under both the United States and Iowa Constitutions. See, e.g. , id. at 167, & n.15, 170-71 (Fourth Amendment); Kern , 831 N.W.2d at 172-74 (article I, section 8) ; Kurth , 813 N.W.2d at 274-81 (Fourth Amendment) ; State v. Wilkes , 756 N.W.2d 838, 842 (Iowa 2008) (Fourth Amendment); State v. Tague , 676 N.W.2d 197, 204-06 (Iowa 2004) ( article I, section 8 ); State v. Crawford , 659 N.W.2d 537, 541-44 (Iowa 2003) (Fourth Amendment); State v. Moore , 609 N.W.2d 502, 503-04 (Iowa 2000) (en banc) (Fourth Amendment); State v. Carlson , 548 N.W.2d 138, 140-41, 143 (Iowa 1996) (Fourth Amendment and article I, section 8 ).
The community caretaking exception has three branches: "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception." Tyler , 867 N.W.2d at 170 (quoting Kurth , 813 N.W.2d at 274 ). The emergency-aid and public-servant doctrines are closely related. See Kurth , 813 N.W.2d at 274 (quoting Crawford , 659 N.W.2d at 541 ).
Under the emergency aid doctrine, the officer has an immediate, reasonable belief that a serious, dangerous event is occurring. ... [I]n contrast, the officer *245 in a public servant situation might or might not believe that there is a difficulty requiring his general assistance. For example, an officer assists a motorist with a flat tire under the public servant doctrine, but an officer providing first aid to a person slumped over the steering wheel with a bleeding gash on his head acts pursuant to the emergency aid doctrine.
Tyler , 867 N.W.2d at 170 (alterations in original) (quoting Crawford , 659 N.W.2d at 541-42 ). Other than that slight distinction, the two doctrines are analytically similar. See id. ; see also Kern , 831 N.W.2d at 173 (describing them as "very similar").
We have said that application of the community caretaking exception involves a three-step analysis:
(1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?
Crawford , 659 N.W.2d at 543 ; accord Tyler , 867 N.W.2d at 170 ; Kern , 831 N.W.2d at 173 ; Kurth , 813 N.W.2d at 277. We have cautioned that "[e]very community caretaking case must be assessed according to its own unique set of facts and circumstances." Kurth , 813 N.W.2d at 277.
B. Community Caretaking Under the Fourth Amendment. Coffman first challenges Deputy Hochberger's stop under the Fourth Amendment. We have not previously considered whether a law enforcement officer is justified in parking behind and activating his emergency lights to check on a motorist pulled over on the side of the highway in the middle of the night. In Moore , we held that a park ranger properly exercised a public-safety function when she stopped the defendant's vehicle to warn him that his speed posed a danger to park campers, even though he was driving under the speed limit. 609 N.W.2d at 503-04. In Kurth , we held that a police officer was not justified in blocking in the defendant's vehicle with his own where the defendant had turned into a restaurant parking lot and parked that vehicle after apparently running over a road sign that had fallen into the street. See 813 N.W.2d at 278-81. That seizure occurred after the officer had already ascertained that the damage to the vehicle was "not significant" and the defendant "was in a position to address that damage." Id . at 280.
Other state courts, however, have addressed situations close to the present case. As we pointed out in Kurth , it is "not surprising" that much of the relevant caselaw has arisen in state courts "in light of the fact that community caretaking is generally the role of local police rather than federal officers." Id. at 273-74. The majority of other state courts have sustained seizures similar to the one that occurred in the present case.
The Illinois Supreme Court upheld a stop under the community caretaking doctrine in People v. McDonough , 239 Ill.2d 260, 346 Ill.Dec. 496, 940 N.E.2d 1100, 1110 (Ill. 2010). A trooper was on patrol at 7:30 p.m. when he noticed a car stopped on the shoulder of a busy highway with the headlights off. Id. , 346 Ill.Dec. 496, 940 N.E.2d at 1103. The trooper "decided to inquire whether the car's occupants needed assistance." Id. The trooper turned on his overhead oscillating emergency lights for safety purposes and pulled in behind the stopped vehicle. Id. , 346 Ill.Dec. 496, 940 N.E.2d at 1103-04. The trooper's initial question upon approaching the vehicle was whether everything was okay. Id. , 346 Ill.Dec. 496, 940 N.E.2d at 1104. The driver rolled down the window further to answer, and the trooper smelled the odor of *246 an alcoholic beverage. Id. After failing field sobriety tests, the driver was arrested. Id.
The Illinois court determined that the seizure was permissible under the community caretaking exception to the warrant requirement of the Fourth Amendment. Id. , 346 Ill.Dec. 496, 940 N.E.2d at 1109. In coming to this conclusion, the court said,
[I]t was reasonable for [the trooper] to approach defendant's vehicle to offer any aid required under the circumstances. The public has a substantial interest in ensuring that police offer assistance to motorists who may be stranded on the side of a highway, especially after dark and in areas where assistance may not be close at hand. In the proper performance of his or her duties, a law enforcement officer has the right to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles. The occupant of a parked vehicle may be intoxicated, suffering from sudden illness, or may be only asleep. Under these circumstances, it is within a responsible law enforcement officer's authority to determine whether assistance is needed.
Id. , 346 Ill.Dec. 496, 940 N.E.2d at 1109-10 (citation omitted).
In State v. Anderson , the Utah Supreme Court likewise held that the seizure of a motorist who had stopped his vehicle on the side of the road was justified by the community caretaking doctrine under the Fourth Amendment. 362 P.3d 1232, 1234 (Utah 2015). Late one evening in December, the defendant had pulled his car to the side of the road and turned his hazards on. Id. "Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle." Id. The deputies engaged their red and blue flashing lights and pulled up behind the stopped vehicle. Id. After they asked him whether he needed assistance, the deputies noticed that he had bloodshot eyes. Id. They ultimately "obtained a warrant authorizing them to arrest [the defendant], obtain blood or urine from him, and search his vehicle," within which they found marijuana. Id. at 1235. The court concluded that the stop was minimally invasive into the defendant's rights and that "a reasonable officer would have cause to be concerned about the welfare of a motorist in [the defendant's] situation." Id. at 1239-40. The court further noted,
A motorist may have many motivations for pulling to the side of a highway and engaging hazard lights, ranging from the mundane to the life-threatening. The motorist could be lost, disciplining rowdy children, sleeping, or answering a cell phone call. But there is also a good chance that the motorist has run out of gas, has mechanical problems, or, worse, is experiencing a medical emergency. The fact that it is very cold and dark would exacerbate the duress of a motorist in need of aid. Given the decent odds that a motorist in this situation may need help, an officer would have reason to be concerned and to at least stop to determine whether assistance is needed.
Id. at 1240.
In Ullom v. Miller , the West Virginia Supreme Court of Appeals likewise found a seizure of a motorist was justified under the community caretaking exception under both the Fourth Amendment and the West Virginia Constitution. 227 W.Va. 1, 705 S.E.2d 111, 123 (2010). The defendant there had parked on the side of the road and turned on the parking lights. Id. at 116. The vehicle's hazard lights were not on, and the engine was not running. Id.
*247 When the officer came across the vehicle at dusk during his patrol, he had no other indication the driver needed assistance. Id. The officer nevertheless "initiated a road safety check of the vehicle by stopping his cruiser and approaching the vehicle." Id. When he conversed with the driver, he noted signs of intoxication. Id. Upon failing sobriety tests, the driver was arrested for driving under the influence. Id.
The West Virginia court held that given the circumstances of the case, "a reasonable and prudent officer in such a setting would have reasonably suspected that an occupant of the vehicle was in need of immediate help." Id. at 123. Furthermore, the officer's "initiating reasons for his encounter with [the defendant] were, when viewed objectively, quite clearly a reasonable, independent and substantial justification for any intrusion he made into [the defendant's] privacy." Id.
In State v. Kramer , the Wisconsin Supreme Court also affirmed the seizure of a motorist over federal and state constitutional objections. 315 Wis.2d 414, 759 N.W.2d 598, 601 (2009). In that case, the defendant's vehicle was legally parked on the shoulder of a highway after the sun had set. Id. The driver had turned the hazards on while he made a phone call. Id. A sheriff's deputy spotted him, activated his cruiser's emergency overhead lights, and stopped behind the parked car. Id. The deputy's reason for stopping was "to check to see if there actually was a driver, [and to] offer any assistance." Id. (alteration in original). The deputy activated his own emergency lights for "[s]afety considerations so other traffic could see [him]." Id. (first alteration in original). Although he approached the vehicle shining his flashlight and with his hand on his holstered gun-a practice the deputy regularly followed "for safety considerations"-he asked the driver if he could help with something and said he was "[j]ust making sure [there were] no vehicle problems." Id. at 601-02. During the interaction, the deputy could tell that the driver was intoxicated, and the driver was then arrested. Id. at 602.
The Wisconsin court held that the seizure was justified. Id. at 612. It concluded the deputy had "an objectively reasonable basis for deciding that a motorist may have been in need of assistance when he stopped behind [the defendant's] vehicle." Id. at 610. The court also noted "that the public has a substantial interest in ensuring that police assist motorists who may be stranded on the side of a highway, especially after dark and outside of an urban area when help is not close at hand." Id. at 611.
In State v. Lovegren , the Montana Supreme Court similarly upheld a seizure of a motorist based on the community caretaking doctrine. 310 Mont. 358, 51 P.3d 471, 476 (2002). There, an officer noticed a vehicle parked on the side of the highway at 3:05 a.m. Id. at 471-72. Upon approaching the vehicle, the officer found the defendant asleep in the driver's seat and knocked on the window. Id. at 472. When the defendant did not wake up, the officer opened the door. Id. The defendant suddenly awoke and blurted, "I was drinking." Id. The officer spotted other signs of intoxication, and after the defendant failed the field sobriety tests, he was charged with driving under the influence. Id.
Overruling both federal and state constitutional objections, the Montana court found the officer had acted properly because the officer had "objective, specific and articulable facts suggesting that [the defendant] might be in need of assistance." Id. at 476. According to the court,
While [the defendant] might simply have been asleep, he might just as likely have been ill and unconscious and in need of *248 help. Under these circumstances, Officer Hofer had the right to check on [the defendant's] welfare and to open the door of [the defendant's] vehicle when [the defendant] failed to respond to a knock on the window of his vehicle. As the State points out, it would have been a dereliction of Officer Hofer's duties if, after knocking on the window and obtaining no response, Officer Hofer walked away and continued on his patrol.
Id.
The Tennessee Supreme Court confronted a similar situation in State v. McCormick and found the seizure was justified by the community caretaking doctrine under the United States and Tennessee Constitutions. 494 S.W.3d 673, 689 (Tenn. 2016). At 2:45 a.m., a law enforcement officer pulled behind a vehicle that was sitting in the entrance to a shopping center parking lot. Id. at 676. The shopping center was closed, and the back left wheel and rear portion of the vehicle were "partially in the roadway." Id. The officer parked behind the vehicle and turned on his blue lights for safety reasons. Id. He proceeded "to do a welfare check on the subject in the vehicle." Id. The driver was slumped over the steering wheel, the engine was running, and the headlights were on. Id. When the officer was unable to awaken the driver by tapping on the window, he opened the car door. Id. The officer immediately detected signs that the driver had been drinking. Id. The driver failed field sobriety tests and was arrested for driving under the influence. Id. at 676-77.
The Tennessee court determined that the officer's conduct fell within the community caretaking exception. Id. at 688-89. The court explained,
Given the time, 2:45 a.m., location, and limited accessibility and availability of assistance from sources other than the officer, the risk of danger had the officer provided no assistance was substantial. Indeed, Sgt. Trivette would have been "derelict in his duty as a police officer" had he failed to take steps to determine the defendant's welfare. Again, the defendant was slumped over the steering wheel, either asleep or unconscious, with his vehicle protruding partially onto the public roadway, placing him at risk of injury or death from a rear end collision. Having carefully considered the relevant facts, we conclude that Sgt. Trivette's actions were well within the community caretaking exception.
Id. at 688-89 (quoting Commonwealth v. Fisher , 86 Mass.App.Ct. 48, 13 N.E.3d 629, 633 (2014) ).
In State v. Kleven , the South Dakota Supreme Court likewise found that an officer properly exercised his community caretaker function, and therefore concluded the officer's seizure of a motorist was permissible under the Fourth Amendment. 887 N.W.2d 740, 743-44 (S.D. 2016). The officer saw a vehicle parked on the side of the street in the early hours of the morning in a downtown area. Id. at 741. He requested a license plate check. Id. After waiting some twenty minutes, he decided to park his patrol car directly behind the defendant's vehicle and arranged for another patrol car to park directly in front. Id. The officer believed the driver was passed out or asleep. Id. The officer then knocked on the car window; the defendant stirred but did not acknowledge the officer. Id. The officer opened the door and detected the odor of an alcoholic beverage. Id. The driver was arrested and charged with driving under the influence. Id. The court determined that, given the circumstances, the officer had sufficient reason to conduct a health and safety check. Id. at 743.
*249 The North Dakota Supreme Court upheld the seizure of a motorist in Borowicz v. North Dakota Department of Transportation after an officer noticed a vehicle parked on a service road with its headlights on but the motor off. 529 N.W.2d 186, 187 (N.D. 1995). When the officer saw someone slumped in the driver's seat, he pulled behind the vehicle and activated his overhead lights. Id. at 187-88. He approached the driver's side, knocked on the window, and observed that the driver appeared to be asleep. Id. He knocked harder with his flashlight, awakening the driver, who then opened the door to the pickup. Id. In the subsequent interaction, the officer noticed signs of intoxication, and the defendant was eventually arrested. Id. at 187. The court concluded the officer's conduct was reasonable under the circumstances. Id. at 188-89.
In People v. Laake , the Illinois Appellate Court upheld a vehicle seizure under the community caretaking doctrine of the Fourth Amendment. 348 Ill.App.3d 346, 284 Ill.Dec. 203, 809 N.E.2d 769, 772-73 (2004).[1] There, the officer received a report at approximately 3:00 a.m. from police dispatch about a possible intoxicated driver in his area of patrol. Id. , 284 Ill.Dec. 203, 809 N.E.2d at 770-71. While searching for that car, he happened upon a vehicle stopped on the shoulder with its brake lights on. Id. , 284 Ill.Dec. 203, 809 N.E.2d at 771. He pulled behind the vehicle and activated his overhead emergency lights. Id. His purpose was "to check on the welfare of [the] driver." Id. Additionally, "[t]he area was isolated and not well lighted." Id. During the officer's initial encounter with the driver, he noticed telltale signs of intoxication and that the driver had a flat tire. Id. The driver was ultimately convicted of driving under the influence. Id .
The appellate court concluded that there was "nothing wrong" with the officer's "check[ing] on the welfare of [the car's] driver." Id. , 284 Ill.Dec. 203, 809 N.E.2d at 773. "Police officers routinely provide roadside assistance in addition to conducting criminal investigation. Such assistance is designed to ensure public safety, and we do not believe that any concomitant technical detention is unreasonable." Id.
In Marsh v. State , an Alaska appellate court found that a seizure was permitted under the community caretaking exception to the Fourth Amendment warrant requirement. 838 P.2d 819, 820 (Alaska Ct. App. 1992). During the early evening hours, a state trooper noticed a vehicle that appeared to be stalled on the side of a highway. Id. The trooper activated his overhead lights and pulled behind the car; activation of the lights was "standard police procedure so that traffic on the highway could see [the trooper] parked along the road in the dark." Id. At this point, the driver started the engine of his vehicle. Id. Nonetheless, the officer proceeded to speak to the driver and thus learned his license had been revoked. Id . Assuming for purposes of appeal that there had been a seizure, the appellate court determined that the trooper acted properly pursuant to his community caretaking function in finding out whether the driver needed assistance. Id.
In Kozak v. Commissioner of Public Safety , a Minnesota appellate court decided that a deputy's conduct was justified under the community caretaking exception. 359 N.W.2d 625, 628 (Minn. Ct. App. 1984). The defendant had parked on the side of the road and fallen asleep. Id. at 627. A deputy stopped to investigate and knocked on the window to awaken the driver. Id. The driver opened the door, and the deputy noted signs of intoxication. Id.
*250 The driver failed the field sobriety tests and was arrested. Id. The court noted,
In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles.
Id. at 628. The court added,
The occupant of an already parked car may be intoxicated, he may be suffering from sudden illness or heart attack, or may be just asleep. Surely, it is within a responsible peace officer's duty as it relates to the public to determine whether his assistance is needed.
Id.
Coffman directs us to Commonwealth v. Livingstone , a recent case where the Pennsylvania Supreme Court found a Fourth Amendment violation. 174 A.3d 609, 638 (Pa. 2017). In Livingstone , a trooper saw a vehicle pulled over onto the right shoulder of a divided highway with the engine running but the hazard lights not activated. Id. at 614. The trooper "activated his emergency lights and, with his passenger window down, pulled alongside the stopped vehicle." Id . After motioning to the driver to roll down the window, he asked her if she was okay. Id. The driver appeared to be staring at him with "glossy eyes" but answered affirmatively. Id . Nevertheless, the trooper pulled his cruiser in front of the stopped vehicle, exited his vehicle, and approached the driver on foot. Id . When the trooper reached the vehicle, he asked to see the motorist's driver's license and asked whether she had been drinking. Id. The motorist denied drinking but made a number of confused statements. Id. Based on these statements and the appearance of the motorist's eyes, a preliminary breath test was administered, and ultimately the motorist was convicted of driving under the influence. Id. at 614-15.
The Pennsylvania court found that a seizure had occurred as soon as the trooper pulled alongside the stopped vehicle with his flashers on. Id. at 621-25. Turning to the question whether the community caretaking exception applied, the court held that "the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed ." Id. at 637 (emphasis added). Notwithstanding an extensive review of cases like Ullom , Kramer , Lovegren , McCormick , McDonough , and Kleven where similar seizures had been upheld, the court overturned the motorist's conviction. Id. at 629-33, 638. In its view, the trooper was not able to "articulate any specific and objective facts that would reasonably suggest that Appellant needed assistance." Id . at 638 (plurality opinion).
Federal courts have also weighed in on this subject. See, e.g. , United States v. Barry , 394 F.3d 1070, 1075 (8th Cir. 2005) (holding that it was not a seizure when the officer approached the parked vehicle and knocked on the window). For instance, in Winters v. Adams , the United States Court of Appeals for the Eighth Circuit found that a seizure of a driver in a parked vehicle was justified by the community caretaking doctrine. 254 F.3d 758, 764 (8th Cir. 2001).[2] There, the officers were responding to a complaint regarding an unknown, intoxicated individual. Id. at 760, 761. The first officer to arrive came upon a person seated behind the wheel of a car in the suspected area. Id. The officers approached to ask him about his circumstances, and he responded that he was *251 "waiting for a push to start his car." Id. When the officer asked for identification, the driver rolled up the window, locked the door, and said he wanted to be left alone. Id. Neither officer suspected criminal activity, but the driver began acting strangely and moving about wildly in his car. Id. at 760-61. The officers "were initially concerned with determining [the driver's] physical condition in order to ensure that 'he would not be able to drive and hurt someone.' " Id. at 761. Another officer testified that "he felt that he had a responsibility to protect [the driver] and 'the public at large to make sure this person can't hurt anyone else.' " Id. The officers thus broke into the car and forcibly removed the driver, whose ultimate diagnosis was "methamphetamine intoxication." Id. at 761-62.
In determining that the stop was justified, the court found that the officers " 'would have been derelict in their duties' had they not detained" the driver. Id. at 764. (quoting United States v. Rideau , 949 F.2d 718, 720 (5th Cir. 1991), rev'd on other grounds on reh'g , 969 F.2d 1572, 1573 (5th Cir. 1992) (en banc)). To find otherwise would have required the officers "simply to walk away from [the] vehicle, thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens." Id. (footnote omitted).
In United States v. Ingram , the United States Court of Appeals for the Ninth Circuit determined that the seizure of the defendant's parked vehicle was not justified by the community caretaking doctrine. 151 F. App'x 597, 599 (9th Cir. 2005). A U.S. Park Police Officer noticed a vehicle parked at an "awkward angle" and decided to investigate along with another officer. Id. at 598. The court rejected the government's community caretaking argument because
[o]nce the officers were able to observe that the passengers were in no distress of any kind, no "reasonable grounds [existed] to believe that there [was] an emergency at hand and an immediate need for their assistance for the protection of life or property."
Id. at 599 (second and third alterations in original) (quoting United States v. Cervantes , 219 F.3d 882, 888 (9th Cir. 2000), overruled on other grounds by Brigham City v. Stuart , 547 U.S. 398, 404, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006) ).
As previously noted, we examine every community caretaking case before us according to its own set of unique circumstances. Kurth , 813 N.W.2d at 277. We must decide "whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate." Tague , 676 N.W.2d at 204. To demonstrate reasonableness, the State must show "specific and articulable facts that indicate [the officer's] actions were proper." Kurth , 813 N.W.2d at 277 (quoting Crawford , 659 N.W.2d at 542 ).
The present case is unlike our Kurth case or the Ninth Circuit's Ingram case, where objective facts available to the officers indicated that the community caretaking need had dissipated by the time the seizures occurred. See Ingram , 151 F. App'x at 599 ; Kurth , 813 N.W.2d at 280-81. In Kurth , a motorist appeared to have run over a sign that had fallen into the roadway. 813 N.W.2d at 271. By itself, this could have justified an officer's community caretaking intervention. Id. at 278. However, the motorist thereafter promptly and lawfully pulled into the parking lot of an open restaurant and parked his vehicle. Id. at 271-72. The officer saw that there was no difficulty with the drivability of the vehicle and the damage to the vehicle was insignificant. Id. at 272, 278. Nevertheless, *252 at that point the officer activated his emergency lights and blocked in the vehicle. Id. at 278. In short, in Kurth , the putative community caretaking seizure occurred only after the need for such a seizure had ended. Id. The motorist was parked in a parking lot of an open restaurant and appeared to be in a position to address any minor vehicle damages. Id.
Other cases cited by Coffman are distinguishable for the same reasons. See State v. Graham , 340 Mont. 366, 175 P.3d 885, 891 (2007) (finding under federal and state constitutional principles that the seizure of a parked vehicle on a dirt pullout was not reasonable where the officer had seen the truck driving shortly before the stop and thus knew that it was operable); State v. Button , 195 Vt. 65, 86 A.3d 1001, 1005 (2013) (holding that the stop was not justified under the Fourth Amendment or state constitution in part because "[t]he trooper saw that all of the various lights on defendant's car were operating properly, and that defendant's car was running fine").
This case also can be distinguished from cases cited by Coffman where the vehicle was parked well off the road, and therefore, the officer could have safely stopped and sought to speak with the driver without activating his flashers. See State v. Schmidt , 137 Idaho 301, 47 P.3d 1271, 1272, 1274 (Idaho Ct. App. 2002) (finding that the seizure of the vehicle by activating the overhead lights and blocking it in was not justified under the Fourth Amendment where the vehicle was "parked twenty to thirty feet off on the right side of the road in an unimproved pullout"); State v. Boutin , 161 N.H. 139, 13 A.3d 334, 337-38 (2010) (finding under the state constitution that the trooper's actions were unreasonable when the vehicle was parked in a "pull-off area" and the trooper could have pulled alongside the driver to do a welfare check without performing a seizure by activating his flashers).
The present case is also unlike our own State v. Coleman , where after the vehicle had been seized, objective facts became available to the officer demonstrating the problem that was the basis for the stop had been resolved. See 890 N.W.2d 284, 285, 301 (Iowa 2017) (holding that after stopping a motorist on suspicion of driving while suspended, but then determining that the driver was not the motorist in question, the officer had to let the motorist go immediately without asking for license, registration, and proof of insurance). This case is actually the reverse of a Coleman situation. After making the initial stop, Deputy Hochberger determined that there was a violation with respect to vehicle registration, thus providing further justification for the stop.
Lastly, Livingstone , the Pennsylvania case on which Coffman relies, is factually and legally distinguishable. In Livingstone , the trooper came upon the motorist at 9:30 p.m. and acknowledged that when he pulls alongside a vehicle, "[n]ine out of ten times usually they're on their cell phone." 174 A.3d at 638. In the present case, though, Deputy Hochberger came upon a vehicle pulled just off a rural road after 1:00 a.m. The odds that a law enforcement officer was just interrupting a routine cell phone call diminish, undoubtedly, as the hour gets later.
Furthermore, Livingstone 's invariable requirement that the officer have "specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed ," id. at 637 (emphasis added), is inconsistent with the more flexible standard in our caselaw-i.e., "whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate,"
*253 Tague , 676 N.W.2d at 204 ; see Kurth , 813 N.W.2d at 277 (requiring the state to show "specific and articulable facts that indicate [the officer's] actions were proper" (quoting Crawford , 659 N.W.2d at 542 )). Under our precedent, the officer does not need specific facts indicating that assistance is needed, only that it may be needed. See Kern , 831 N.W.2d at 172 ; see also Tyler , 867 N.W.2d at 170 ; cf. Livingstone , 174 A.3d at 617 (noting the Pennsylvania Superior Court, which was reversed in the opinion, upheld the trooper's actions because "the circumstances were sufficient to suggest ... that assistance might be needed").
When we apply our three-part inquiry as set forth above, we believe the stop in this case complied with the Fourth Amendment. Under the first part of the test, the State concedes there was a seizure. Next, we consider whether Deputy Hochberger's conduct amounted to bona fide community caretaking activity.
At the suppression hearing, Deputy Hochberger testified that he regularly stops behind vehicles stopped alongside the roadway in order to "check on the welfare of the occupants or see if they need any assistance." In this case, it was the middle of the night, Deputy Hochberger was traveling along a highway slightly outside of town, the vehicle was pulled over just two feet off from the roadway itself, and the vehicle's brake lights were activated. We conclude this was bona fide community caretaking activity.
Lastly, we balance the public need and interest against the intrusion on privacy. We believe the public interest in having officers check on the welfare of a motorist pulled over at the side of a highway in the middle of the night is significant. There could be many reasons why the motorist needs help. The motorist could be lost, there could be trouble with the vehicle, or the motorist could be in some kind of medical difficulty. Coffman was parked on the side of the highway at 1:00 a.m. without his hazard lights on. This created a potentially dangerous situation for himself and for other drivers who may not have seen him. The remote location and the late hour may have made it difficult for him to obtain help if he had needed it.
At the same time, the privacy intrusion was not great. A seizure occurred only because Deputy Hochberger activated his emergency flashers. Deputy Hochberger did this for everyone's benefit, so the pulled-over vehicles would be visible and so the motorist-Coffman-would know it wasn't just a stranger approaching from behind. Cf. Kurth , 813 N.W.2d at 281 (noting that the officer activated his emergency flashers even though the defendant had parked in the lot of an open restaurant and the officer "could not and did not argue that he activated his emergency lights for his own protection"). The vehicle was already at rest when Deputy Hochberger activated the flashers, and the setting was by the side of a highway. See id. at 280-81. After performing this balancing, we conclude the public interest here outweighed the intrusion on privacy. We find the decisions discussed above from appellate courts in Utah, West Virginia, Wisconsin, Montana, Illinois, Tennessee, South Dakota, North Dakota, Alaska, and Minnesota to be persuasive.
Furthermore, the deputy's actions here were tailored to providing assistance only to the extent it may have been needed. See id. at 278 ("[T]he officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." (quoting Crawford , 659 N.W.2d at 542-43 )) Deputy Hochberger's conduct, which included activating his emergency lights, parking behind the parked car, and approaching the *254 vehicle on foot to check on its occupants, was reasonable given the objective of safely determining whether the motorist needed help. See, e.g. , Anderson , 362 P.3d at 1240. The deputy's decision to address this roadside situation was not unreasonable, and arguably it would have been "a dereliction of duty" to ignore it. See Lovegren , 51 P.3d at 476. Many motorists would appreciate and expect officers to engage in this kind of community caretaking activity.
Coffman suggests the deputy should not have stopped behind his vehicle and could have accomplished his community caretaking purpose by pulling alongside it instead. This would have been impractical. See Kramer , 759 N.W.2d at 611 ("Kramer suggests that Wagner could simply have pulled up along side of his vehicle, rolled down the window and asked if Kramer needed assistance. We conclude that doing so would have required Wagner to stop in the middle of one lane of a two-lane highway. Doing so would have added to the dangerousness of the stop for both Wagner and Kramer, if an inattentive motorist had come to the crest of the hill without appreciating that the officer's vehicle was blocking one lane of traffic."). The best way for Deputy Hochberger to determine whether the Coffmans needed help was to talk to them.
Providing help to motorists is an important function performed by law enforcement officers. In 2016 alone, Iowa state troopers assisted more than 11,462 motorists in need. Iowa Dep't Pub. Safety, FY2016 Annual Report 22 (2016), www.dps.state.ia.us/commis/pib/Annual_Report/2016/FY2016AnnualReport.pdf [https://perma.cc/J7E4-RMT]. The year before, the Story County Sheriff's Office reported assisting 957 motorists. Story Cty. Sheriff's Office, 2015 Annual Report , Story County, Iowa 11 (2015), http://www.storycountyiowa.gov/index.aspx?NID=963 [https://perma.cc/H6QW-XZ3U]. By way of comparison, this is only slightly less than the number of speeding tickets the office issued. Id.
We hold that this particular encounter fell within the community caretaking exception to the Fourth Amendment's warrant requirement, as we have interpreted that exception in prior cases and as most other jurisdictions have interpreted it.
C. Community Caretaking Exception Under Article I, Section 8. Coffman also argues that even if the stop complied with the Fourth Amendment, we should interpret the community caretaking doctrine differently under the Iowa Constitution. The State counters that error has not been preserved on this point because the defendant did not assert this position until he filed a motion for reconsideration of the denial of his motion to suppress. The district court, however, did not indicate that it was declining to consider Coffman's arguments for reconsideration as untimely but instead reached their merits. Accordingly, we conclude error was preserved. See State v. Bowers , 661 N.W.2d 536, 540 (Iowa 2003) (electing to review an untimely motion to suppress on the merits where the district court reached the merits).
"What is required under the Iowa Constitution, in each and every case that comes before us, is ... exercise of our best, independent judgment of the proper parameters of state constitutional commands." State v. Short , 851 N.W.2d 474, 490 (Iowa 2014).
In his appellate briefing, Coffman appears to merge the two distinct Iowa constitutional arguments he made below. That is, under article I, section 8, he asks us to do away with the public servant component of the community caretaking exception for evidentiary purposes only. Evidence could be used if it was obtained when an officer *255 had "an immediate reasonable belief that a serious, dangerous event [was] occurring"-i.e., "that emergency aid is required." Meanwhile, police would still be free to respond to other community caretaking situations without violating the Iowa Constitution, but evidence from those situations could not be used.
In short, Coffman would have us establish two tiers of community caretaking interventions. Both would be lawful and constitutional, but only "emergency" interventions could provide source material for subsequent criminal prosecutions.
In support of this argument, Coffman cites Commonwealth v. Canavan , a decision of the Massachusetts Appeals Court. 40 Mass.App.Ct. 642, 667 N.E.2d 264 (1996). Canavan is actually a Fourth Amendment decision, not a state constitutional case. Id. at 268 n.8. There, the appellate court found an officer was not justified in pulling over a moving vehicle that he suspected to be lost. Id. at 265, 268. The officer had no other basis for believing the driver needed assistance. Id. at 265. The court noted that the interest in aiding the motorist "may 'be as well served by having the police officer make his presence known and leaving to the motorist the decision as to whether to stop and seek directions.' " Id. at 266 (quoting United States v. Dunbar , 470 F.Supp. 704, 707 (D. Conn. 1979), aff'd , 610 F.2d 807 (2d Cir. 1979) ). The decision itself, however, does not limit community caretaking to emergency situations. Instead, it draws a distinction between a lost motorist and one who may potentially be at risk to himself or others:
Dunbar does not inhibit the police from making intrusions amounting to seizures when the governmental interest predominates-thus seizure even of lost motorists is justified when safety hazards are actually entailed and lights and sirens are needed to arouse the attention of the drivers and avoid mishap.
Id. at 267.
Furthermore, the Massachusetts court cited with approval Commonwealth v. Leonard , 422 Mass. 504, 663 N.E.2d 828 (1996), a Massachusetts Supreme Judicial Court decision in which the court upheld a police action taken based upon the potential illness of the driver. Canavan , 667 N.E.2d at 268. In Leonard , a state trooper was determined to be justified in pulling over a driver pursuant to the community caretaking doctrine because, according to the Canavan court, "the police action as a whole, the opening of the door included, might be seen as part of the interaction of citizen with police for the well being of the person and so raising no constitutional issue." Id. (citing Leonard , 422 Mass. at 508-09, 663 N.E.2d 828 ). Leonard is closer to the present case than Canavan . Neither decision supports Coffman's proposed interpretation of article I, section 8.
Notably, in another case with even more factual similarity to ours, the Massachusetts Supreme Judicial Court upheld the stop under the community caretaking exception. See Commonwealth v. Evans , 436 Mass. 369, 764 N.E.2d 841, 844 (2002). In Evans , a state trooper saw a car pulled over on the side of a highway with its right blinker flashing at 11:30 p.m. Id . at 843. The trooper pulled behind the parked vehicle and activated his cruiser's lights, then approached the driver on foot to see if he needed assistance. Id . The court held this conduct "falls squarely under the trooper's community caretaking function." Id . at 844.
Coffman's opening brief also cited Provo City v. Warden , 844 P.2d 360 (Utah Ct. App. 1992). There, the Utah Court of Appeals-again applying the Fourth Amendment rather than a state constitutional provision-did "adopt ... the imminent *256 danger to life or limb" standard proposed by Coffman. See id . at 364-65. Warden also said that "stops which are legitimate exercises of police community caretaker responsibilities, but which are not 'reasonable' under the Fourth Amendment, may result in application of the exclusionary rule, while still achieving the objectives of community caretaking." Id. at 365. However, Warden is not good law, even in Utah. The State pointed out in its answering brief that Warden was expressly overruled by the Utah Supreme Court in Anderson , 362 P.3d at 1237, 1239. Accordingly, Coffman dropped any reference to Warden in his application for further review to this court.
As noted, Coffman maintains we should apply the exclusionary rule to any nonemergency acts of community caretaking, even if the acts were otherwise proper. However, the exclusionary rule exists in Iowa as a "remedy for the constitutional violation" and to "protect[ ] the integrity of the courts." State v. Cline , 617 N.W.2d 277, 289 (Iowa 2000) (en banc), overruled on other grounds by State v. Turner , 630 N.W.2d 601, 606 n.2 (Iowa 2001). It "places the parties in the positions they would have been in had the unconstitutional search not occurred." Id. If law enforcement has acted in a way that is not unconstitutional or illegal but is in fact socially desirable, our article I, section 8 precedent does not provide a basis for suppressing the results of that conduct.
Law professor Michael R. Dimino Sr. elaborated on this point in the context of community caretaking searches, stating,
Searches are either reasonable or unreasonable. Generally speaking, reasonable searches are constitutional and give rise to no issue of remedy. Unreasonable searches are unconstitutional and usually result in exclusion of evidence found during the unreasonable search. The targeted exclusionary rule, however, either requires exclusion when the police were acting reasonably in fulfilling community-caretaking function, or calls the community-caretaking search unreasonable and excludes evidence-all the while winking and nodding to police departments to encourage them to act in the very manner the court holds to be unconstitutional.
Michael R. Dimino Sr., Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness , 66 Wash. & Lee L. Rev. 1485, 1558 (2009) [hereafter Dimino] (footnotes omitted). We agree with Professor Dimino's basic line drawing: police conduct is either legal or illegal, and if it is legal, its fruits should not be suppressed under the Iowa Constitution.[3]
*257 Recently, in State v. Ramirez , this court confronted the question whether the results of a federal search that complied with the federal law on anticipatory warrants should be excluded from a state prosecution because Iowa law does not authorize anticipatory warrants. 895 N.W.2d 884, 886 (Iowa 2017). We concluded,
When a bona fide federal investigation leads to a valid federal search, but the evidence is later turned over to state authorities for a state prosecution, we do not believe deterrence or judicial integrity necessarily require a reexamination of the search under standards that hypothetically would have prevailed if the search had been performed by state authorities.
Id. at 898. A dissent disagreed and would apply the exclusionary rule to any search within Iowa that would have violated the Iowa Constitution or Iowa statutes if conducted by Iowa officials. See id . at 899 (Wiggins, J., dissenting). However, Coffman wants to go a step further than the Ramirez dissent and suppress the results of a stop even if it violated neither the Iowa Constitution nor Iowa law. We are not persuaded this is appropriate.
During his oral argument before our court, Coffman changed course somewhat from his appellate briefing. First, Coffman posited that "the public servant doctrine should not allow officers to seize individuals." This of course would extinguish the doctrine altogether. Our discussion heretofore explains why we do not find this jurisprudential approach persuasive.
Second, Coffman urged us to restrict the public servant doctrine to circumstances where the officer has a firm basis for concluding that the motorist actually needed assistance. As his counsel elaborated, he would "requir[e] the state to show specific, objective facts as to why a need existed."
Clearly, a community caretaking seizure of a motorist must be supported by objective grounds to believe the motorist or a third party affected by the motorist may need assistance. Still, we would not set the required threshold of proof as high as Coffman would. Coffman's threshold would deter officers from stepping into a situation, like the one in this case, where the motorist may need help but the officer cannot tell. Helping a citizen and investigating a citizen for commission of a crime are two different things. An officer lacking a warrant should have somewhat more latitude to do the former than to do the latter.
Thus, we believe the basic three-part test we have applied to community caretaking seizures of motorists under the Fourth Amendment also provides an appropriate standard under article I, section 8. See Kurth , 813 N.W.2d at 277 ; Crawford , 659 N.W.2d at 543. The requirements embedded in that test-that the community caretaking be "bona fide" and that "the public need and interest outweigh the intrusion upon the privacy of the citizen"-will protect against abuse of this warrant exception. Crawford , 659 N.W.2d at 543.
We do note, however, one qualification. In applying the Fourth Amendment, we have said that "the relevant test for determining whether the community caretaking exception applies is an objective one based on the information available at the time of the stop and does not depend upon the subjective motivations of the individual officers involved." Kurth , 813 N.W.2d at 279 n.3. Under article I, section 8, though, we believe it is incumbent on the state to prove both that the objective facts satisfy the standards for community caretaking and that the officer subjectively intended to engage in community caretaking. As we implied in Kurth , the term "bona fide" generally has both an objective and a subjective component. See id . One law professor *258 has advocated requiring proof of "a good-faith community-caretaking motivation" in the search context. See Dimino, 66 Wash. & Lee L. Rev. at 1534. Closer to home, a law student note has specifically recommended that there should be a "subjective good faith requirement" for community caretaking seizures under article I, section 8. See John W. Sturgis VII, Note, Help! I Need Somebody (Or Do I?): A Discussion of Community Caretaking and "Assistance Seizures" Under Iowa Law , 99 Iowa L. Rev. 1841, 1873 (2014) ; see also Mary Elisabeth Naumann, The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception , 26 Am. J. Crim. L. 325, 359 (1999) ("The concern over the use of the doctrine as a pretext for criminal investigations tends to be the most common objection to both the use and extension of the community caretaker doctrine.").[4]
We find these authors' arguments persuasive. Investigatory seizures of motorists and community caretaking seizures of motorists should remain analytically separate. Otherwise, the latter could become simply a way to perform an investigation without meeting the reasonable suspicion or probable cause standard. To insure this separation, therefore, we hold that under the Iowa Constitution, a community caretaking seizure of a vehicle must be undertaken for genuine community caretaking purposes. In a sense, this restores the community caretaking exception to its roots, where it was "totally divorced" from criminal investigation. See Cady , 413 U.S. at 441, 93 S.Ct. at 2528.
Here, based on our de novo review of the record while giving deference to the district court's findings, we conclude that Deputy Hochberger's motivation was to assist Coffman. Like the district court, we note that Deputy Hochberger did not run the vehicle's plates through dispatch but instead immediately went up to the driver's side of the vehicle and asked if everything was okay. Therefore, the seizure in this case met the additional requirement we have just recognized under article I, section 8.
In sum, we do not believe the conduct of the deputy in this case was unconstitutional or even deserving of criticism. Iowans expect law enforcement on patrol to offer a helping hand in situations like this where a motorist is pulled over on a public highway at night and may be in difficulty. As noted above, Iowa state troopers assisted over 10,000 motorists in need in a single year, and the sheriff's office of this county assisted nearly 1000 motorists in that time span. Applying the same three-part test we have used under the Fourth Amendment, but modifying it to impose a further requirement that the officer acted out of a genuine community caretaking motivation, we find that the stop here did not violate article I, section 8.
*259 IV. Conclusion.
For the reasons stated, we affirm the judgment of the district court and the decision of the court of appeals.
DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.
Cady, C.J., and Waterman and Zager, JJ., join this opinion. Appel, J., files a dissenting opinion in which Wiggins, J., joins. Hecht, J., takes no part.

We distinguished the Laake decision in Kurth . See Kurth , 813 N.W.2d at 280-81.

We also distinguished Winters in our Kurth decision. See 813 N.W.2d at 275-76.

Professor Dimino finds that a total of ten states do not recognize community caretaking searches as a valid warrant exception in nonemergency situations. See Dimino, 66 Wash. & Lee L. Rev. at 1503-04. The lead case is People v. Mitchell , 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976), abrogated by Stuart , 547 U.S. at 404-05, 126 S.Ct. at 1948.
The present case, however, involves a vehicle seizure, not a search. See John W. Sturgis VII, Note, Help! I Need Somebody (or Do I?): A Discussion of Community Caretaking and "Assistance Seizures" Under Iowa Law , 99 Iowa L. Rev. 1841, 1863 (2014) (noting that all ten of these jurisdictions use the Mitchell test exclusively on searches). Coffman cites no case other than the overruled Warden decision that has limited community caretaking seizures of vehicles to emergency situations. It does appear that Nevada, a jurisdiction not included in Professor Dimino's list of ten, will uphold a community caretaking stop of a vehicle "only where there are clear indicia of an emergency." State v. Rincon , 122 Nev. 1170, 147 P.3d 233, 237 (2006).
We emphasize that today's decision applies only to vehicle seizures and should not be extended to searches.

Several other state courts, applying the Fourth Amendment, have held that community caretaking stops of vehicles must be for community caretaking purposes or at least must take the officer's motive into account. See State v. Marx , 289 Kan. 657, 215 P.3d 601, 606 (2009) ("The State failed to carry its burden of justifying the initial detention of the Marxes' motor home as a public safety stop for community caretaking purposes."); State v. Rinehart , 617 N.W.2d 842, 844 (S.D. 2000) (affirming denial of a motion to suppress a community caretaking traffic stop because the officer testified "his whole intention in stopping Rinehart was to see if he was all right" and "the trial court did not find fault with [the officer's] motives and was able to judge the officer's credibility as he testified"); Kramer , 759 N.W.2d at 607 ("[W]hen a search or seizure is not supported by probable cause or reasonable suspicion and it is contended that the reasonableness of police conduct stands on other footing, an officer's subjective motivation is a factor that may warrant consideration.").